## ALDRIDGE v. MUIRHEAD.

1. Where lands in New Jersey, paid for out of the separate estate of a married woman are conveyed to her, she is considered to be the owner of them, as if she were a *feme sole.*
2. Under the laws of that State the separate property of a woman may, with her consent, be managed by her husband, without necessarily subjecting to the claims of his creditors it, or the proceeds which by reason of his management arise therefrom.

APPEAL from the Circuit Court of the United States for the District of New Jersey.

The facts are stated in the opinion of the court.

*Mr. Robert Gilchrist* for the appellant.

*Mr. Cortlandt Parker,* and *Mr. John Linn, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a suit in equity brought by the assignee in bankruptcy of Thomas Aldridge, to reduce to his possession, as part of the estate, property standing in the name of Anne Aldridge, the wife of the bankrupt. The theory of the bill is that the bankrupt, while largely indebted, purchased the property in controversy with his own means, and took the title in the name of his wife to keep it away from his creditors.

New Jersey has been among the most liberal of the States in modifying the rules of the common law prescribing the rights of the husband in the property of his wife and in protecting her against the claims of his creditors. In 1851 a widow was given the right to demand from the personal representative of her deceased husband all personal property which at or immediately before her coverture belonged to her, or which came to her during coverture by bequest, gift, or inheritance, if it remained in his possession at the time of his death. Laws of 1851, p. 201. In 1852 it was enacted that a married woman might receive by gift, grant, devise, or bequest, and hold for her sole and separate use, real and personal property, and the rents, issues, and profits thereof, and that her sole and separate property should not be subject to the disposal of her husband or liable for the payment of his debts. Laws of 1852, p. 407. In 1857 married women were authorized to bind themselves by covenants in conveyances of their lands, provided their husbands joined with them in the deed (Laws of 1857, p. 485), and in 1862 it was enacted that if a married woman transacted business or purchased property, and thereby contracted debts, she might be sued at law for the recovery of the amount, and that any judgment thus obtained should bind her property. Laws of 1862, pp. 271, 272.

It is conceded by the counsel for the appellee that the circuit judge expressed the law of the State accurately when he said in his opinion, filed with the record, that " the courts of the State, in numerous decisions, have construed it (the act of 1852) to authorize the acquisition by a married woman of personal prop-

erty and real estate, and to intercept the common-law right of her husband to reduce her personal property to possession, and to appropriate the rents, issues and profits of her real estate, as an incident of his initiate estate by the curtesy." Another principle stated by the circuit judge is also conceded to be correct. It is as follows: "When therefore (in New Jersey), the title to real estate is conveyed to a married woman she must be considered the bona fide owner of it, as if she were a single female. But it must be entrenched in the real good faith by which an honest acquisition is distinguished. If it is purchased by her or for her, no matter by whom, and is paid for out of her separate estate, its validity cannot and ought not to be questionable. But if she has no separate estate, or that is disproportionately small compared with the consideration ostensibly furnished by her, and her means are materially supplemented by her husband's contribution from resources, whether money or its equivalent, which he could not rightfully so apply, such a transaction does not specially invite, as it certainly does not deserve, any legal sanction." It is equally true that a husband may manage the separate property of his wife without necessarily subjecting it, or the profits arising from his management, to the claims of his creditors. *Voorhees* v. *Bonesteel and wife*, 16 Wall. 16.

Such being the law of the case we come now to consider the facts. Mr. and Mrs. Aldridge, the appellants, were married in 1842. The wife had at the time money and personal property amounting to about one thousand dollars, which came to her by inheritance from a deceased relative. The most of this was invested soon after in furniture for the home of the family. The husband was an instrument-maker by trade, but at some time before 1857 left that business and engaged in the manufacture of oakum. In 1857 his factory was burned, and being unable to collect his insurance money on account of the insolvency of the company in which his property was insured he failed and became utterly insolvent. After giving up all his property to his creditors he remained largely in debt. Confessedly in the early part of 1861 he had nothing. In May of that year he was appointed postmaster at Hudson City, New Jersey. The emoluments of this office were then considerably

less than a thousand dollars a year. He was also a real estate agent and conveyancer.

During that year Mrs. Aldridge received about four hundred dollars from her father's estate in England. In September, a friend of the family had a lot for sale with a barn on it. The price was three hundred and fifty dollars, and the terms easy. A purchase of this lot was made in the name of the wife. Not more than twenty-five dollars, if that, was paid down. The balance of the purchase-money was secured by assuming a mortgage already on the lot for two hundred and fifty dollars, and giving another mortgage, in which the husband and wife joined, for seventy-five dollars. Mrs. Aldridge, with the money she had received from her father's estate, and more which she borrowed from a maiden sister, converted the barn on the lot into a house. The cost of this was between ten and twelve hundred dollars, and the house was occupied by the family as a residence until 1869, when it was sold with the lot for something more than four thousand dollars.

In the course of the years 1863 and 1864, some female friends of Mrs. Aldridge, countrywomen of hers, loaned her nineteen hundred dollars — one furnishing seven hundred, and the other twelve hundred dollars. She also borrowed further sums from her sister, who was frequently an inmate of the family, and seems to have had money. The precise sum got from her sister does not appear, but the evidence leaves no doubt in our minds that with this and the other sums borrowed, she had as her separate capital more than three thousand dollars.

During the years 1863, 1864, and 1865 five different purchases of property were made in her name. The aggregate of all these, except the last, was only a little more than three thousand dollars, and credit was given on much of the purchase-money. Some sales were made in the mean time and a little profit realized. The last of the five purchases was made in January, 1865. The money needed to make up what was wanted for the down payment was raised by a mortgage of one of the previous purchases. The property embraced in the last purchase was sold in the early part of 1866, and a profit of nearly four thousand dollars realized. Many other purchases were made afterwards, but it is conceded that the money to

make the payments came directly or indirectly from the returns of this last fortunate transaction.

While it may not be in all cases quite clear from what particular source the money came that was used in paying for each one of the earlier purchases, the testimony leaves no doubt with us, that, as a whole, they were paid for from the loans made to the wife by her sister and friends, and that all the property she now has is the result of a judicious employment of the capital she thus acquired and its legitimate profits. While the negotiations were all made by the husband, the titles were openly taken in the name of the wife. The appellants were called on to answer whether the purchase-money, or any part of it was paid from the means of the husband, and they stated, under oath, most unequivocally, that it was not. This throws the burden of proof on the complainant, and, after a full and careful examination of the whole case, we are unable to find that any thing which the creditors of the bankrupt could have subjected to the payment of their debts ever went into the property that the wife now holds. Undoubtedly the husband's services were largely the cause of the fortunate results ; but, so far as we have been able to discover, they were devoted to the management of what was both in law and in fact her separate property. Her accumulations from that source do not belong to his creditors.

To our minds it is an important element in this case that the transactions out of which this suit arose, commenced thirteen years or thereabouts, before any attempt was made to impeach them. They were always open, and no effort at concealment was ever made. All deeds were taken in the name of the wife and promptly put on record. The husband's connection with all the purchases and sales must have been well known. The character of his own business must also have been understood. His bank accounts show that he was a large daily depositor in his own name. His checks were numerous and sometimes for considerable amounts. He seems sometimes to have been employed in the course of his business as land agent by heavy property owners. All his debts must have been contracted as early as 1857, and he was not adjudged a bankrupt until 1873. During all the time between these dates it is not shown that

any one ever attempted to interfere with his own business or to reach the property in the name of his wife, some of which she had held six or seven years. This can be explained in no other way than upon the assumption that the creditors knew the money he was depositing was not to any considerable extent, his own, and that his transactions in the name of his wife were in fact what they purported to be, the result of a judicious management of her separate estate. After such delay we are not inclined to set aside what has been permitted to remain so long undisturbed, simply because of an inability to explain with exact certainty from what precise source the money came which went into the purchase of each particular parcel of property. It is sufficient for the purposes of this case, that, with the money Mrs. Aldridge borrowed from her sister and friendly countrywomen, and the profits of her several investments, she had enough of her own, which was her separate estate, to make herself the owner of all she now has without interfering with the just rights of her husband's creditors. The consideration ostensibly furnished by her is not more than we are satisfied she had, and her means were not materially supplemented by contributions from her husband's resources that in law belonged to his creditors. Such services as he rendered in her behalf were no more than were consistent with all the obligations he was under to those to whom he was indebted, and there is no evidence to satisfy us that his own money was used to make any of the payments of purchase-money.

That the several loans, which made up the capital invested were to the wife, and not to the husband, is to our minds entirely clear. The insolvency of the husband was well understood, and it is evident from all the circumstances that the friends who made the loans would never have done so had it not been supposed that the money was to be used for the benefit of Mrs. Aldridge, and that she and her estate were to become bound for the repayment. The laws of New Jersey authorized her to contract such debts, and made her separate estate liable therefor. The signature of the husband to the notes and mortgages did not necessarily make the money or the property for which they were given his. It perfected the obligation of his wife and subjected her property to liability,

but did not transfer her separate estate to him. Unless his means were actually used to pay her debts, his creditors have lost nothing they ever had a right to claim as in law or equity belonging to them. *Conrad* v. *Shomo*, 44 Penn. St. 193; *Brown* v. *Pendleton*, 60 id. 419. As he was at the time hopelessly insolvent, it cannot for a moment be supposed that credit was given to his personal obligation. The wife and her separate estate furnished the only security the parties supposed they had for the money which was loaned.

We have thought it unnecessary to go over the details of the evidence in an opinion. The result we have unanimously reached is that the decree below should be reversed and the cause remanded with instructions to dismiss the bill with costs. It is consequently

*So ordered.*