HYDE and others *v.* FREY and others.

(*Circuit Court, D. Indiana.* October 4, 1886.)

1. HUSBAND AND WIFE—BUSINESS IN WIFE'S NAME—HUSBAND'S CREDITORS—FRAUD.

Under statutes which permit a married woman to make contracts and to do business as a *feme sole* she may avail herself of the services and agency of her husband in the conduct of her business, or management of her property, without necessarily subjecting it, or the profits arising therefrom, to the claims of his creditors; but an insolvent debtor may not use his wife's name as a mere device to cover and keep from his creditors the assets and profits of a mercantile business which is in truth his own.

2. EQUITY—DECREE—ALTERNATIVE ORDER—SUBJECTING PROPERTY TO CLAIMS OF CREDITORS—INJUNCTION—RECEIVER.

In a suit to subject certain property, consisting of stock in trade and real estate, to the claims of certain creditors, after paying certain others, it appeared from the master's report that the surplus from which to pay complainants' claims would be from ten to fifteen thousand dollars, but as, taking into account the probable expense of a disposition of the property by a receiver, the court estimates the net surplus at $7,500, it is ordered that if that sum, or the real estate (valued at $2,000 over incumbrances) and $5,500, shall be turned over or secured to complainants within 10 days, it will be deemed a discharge of complainants' demands as against the property sought to be reached, and a receiver will not be appointed; otherwise a receiver to be appointed; and in the mean time defendants are enjoined from disposing of, or incumbering. any of the property, except by sale at retail, at customary prices, the proceeds thereof to be deposited subject to the order of the court.

In Equity.

This is a suit, by the creditors of Jacob C. Maag, to subject certain real and personal property, which is claimed by his wife, Nancy A. Maag, to the payment of their claims. The master has made two reports in the case,—an original and a supplemental one.

The original report discloses the following facts:

Jacob C. Maag had been in partnership with one Louis C. Frey, under the firm name of Frey & Maag. In 1882, the firm failed, and disposed of all their property to one of their creditors. That transfer was, in a suit between the creditors of Frey & Maag, held to be fraudulent. Whether it was fraudulent on the part of Krippendorf, the assignee, is a question still pending in this court. The plaintiffs in this suit and in that are the same. By the failure, Maag became indebted to the amount of about $20,000, and has remained insolvent ever since. After the failure, Maag learned of an opening for a shoe store at Evansville, Indiana. Maag knew that if he went into business again in his own name his stock would be subject to attachment by his old creditors. After a consultation with his wife, who was living with

her family, at Indianapolis, and with certain merchants of·Cincinnati, it was agreed that a shoe store should be opened at Evansville in the name of N. A. Maag; the following merchants agreeing to sell goods to her on credit: J. Benckenstein & Co., Cowen & McGrath, Durrell Bros. & Co., and Adolph Meyer & Co.

Mrs. Maag had never been engaged in mercantile business, on her own account, before, and had only such knowledge and experience of the business as came to her from the fact of her husband having been engaged in the shoe business for a number of years. Members of the firms above named testified, in effect, that they sold goods to Mrs. N. A. Maag from November, 1882, on, naming, as the amounts of the first bills of goods sold, $900, $1,583.65, $1,323.10, and $1,888.88; that they knew of Maag's failure and financial condition; that they gave credit to his wife; the goods were shipped to her, and charged to her, although bought by Mr. Maag. They consulted together before beginning to sell to them. They looked entirely to the success of the business that was to be done for their pay. They understood that Maag managed the business. Benckenstein & Co. also loaned Mrs. Maag $12,857 for use in the business. The goods were shipped to Evansville, Indianapolis, and Terre Haute.

Charles W. Durrell, of the firm of Durrell Bros. & Co., testified: "We had confidence in him, and sold the goods to her; and at the time I do not know as I even thought of any other reason why it should be so, but that we should bill them only to her. Of course, we could not ever bill them to any one else, and have them safe. We sold them to her, with the expectation that she would make a success of the business, or we would not have had an account with her; but we sold them to her with the expectation that she would have some person to manage the business, and make something out of it, and I expect we knew that person to be Jacob C. Maag. We gave credit to her upon the success of the business, through his managing the business."

In the course of the report, the master says: "The evidence shows that Jacob C. Maag is a man of remarkable energy, and has a peculiar faculty for handling bankrupt stocks of boots and shoes in such a way as to realize handsome profits. His wife and he say that it was understood from the start that he was to manage the business in her name, and from the time it commenced until the present time he has given his entire time and ability to it. The business has been successful, and has resulted in the accumulation of the property named in the bill of complaint, the property, less the incumbrances, being worth now probably from $10,000 to $15,000."

Mrs. Maag had no property, and put none into the business. Shortly after the commencement of the business Maag put in $300, loaned to his wife, which could not be subjected to the payment of complainants' debts, as it was less than the exemption allowed to a householder.

After the filing of the original report, the case was re-referred to the master for a further report, which further report is, in full, as follows:

"SUPPLEMENTAL REPORT.

"In addition to the facts found in my report filed herein August 25, 1886, I now report that the testimony shows that, at the time the arrangement was made between Maag and his wife, no salary or compensation for Maag was ever mentioned, no details were discussed, and all matters were referred to Maag's superior knowledge and acquaintance in the business. Mr. Maag himself testifies that he knows that he obtained authority from his wife to start the business in Evansville in her name because he could not start in business in his own name, and, if he did business at all, it was necessary that it should be transacted in her name.

"As to manner of first purchase of goods for the Evansville store, I report and find that, upon the application made by Maag, goods were furnished by Durrell Bros., Cowen & McGrath, Aldolph Meyer & Co., and J. Benckenstein & Co.; had met Mrs. Maag socially at her husband's house, but the members of the latter firm had no acquaintance with her at all, and none of the members of any of said firms knew her in a business way. She never had been in business, and they knew it. These original creditors have testified that they knew of Maag's insolvency, and gave credit solely to Mrs. Maag. They all testify that they knew she was without any capital or business knowledge, and that they must look to the business for payment, and that they understood that such business was to be managed by Jacob C. Maag, whom they all knew to be a shrewd merchant, of experience. They also say that, because they had nothing but the store to look to for payment, they insured the goods in transit, for their own benefit. When the goods were shipped, Adolph Meyer loaned $50 for the purpose of paying the first half month's rent at Evansville, in order to secure a location at that place. The money was given to Maag for that purpose. The goods sold were charged to N. A. Maag. With the merchandise so purchased, which was received by Jacob C. Maag at Evansville, the store was opened in the name of N. A. Maag on the twentieth day of November, 1882, 60 days after the failure of Frey & Maag. Maag testifies: 'I got about $300 out of that mining stock, [of his own,] which I put into the business of Mrs. Maag. That was all the capital which was ever put into that business. Mrs. Maag had nothing at that time. She has never had anything since, except what the business has realized for her. The profit of the business is all she has now.'

"Mrs. Maag was at Indianapolis at that time, and did not go to Evansville until the middle of February, when she joined her husband at that latter city. This Evansville store was sold out to E. B. Frey, wife of Maag's former partner. In the attachment and in this proceeding, Maag has sworn that the only consideration of this sale to Mrs. Frey was the assumption of debts by the purchaser, but Mrs. Maag testifies that more than $1,000 was paid in notes and cash, which she herself saw.

"About the time of this sale, another store was opened at Terre Haute in the name of N. A. Maag & Co., S. M. Compton being the company. Maag gave all his time to this store, and Compton gave none of his, as he was traveling for an eastern shoe house, and it was agreed that $1,000 per annum should be paid to Maag while this partnership continued. No other salary was ever paid Maag, but the family was supported from this business. No settlement or accounting has ever been had between Maag and his wife. Maag could have commanded a salary of $20 per week, and he says it required that amount to support his family.

"Other stores were subsequently purchased, and at present are being operated, at Indianapolis and other places. In the conduct of these different stores, from the beginning, Maag has had control of the management of the business. While he has sometimes talked to his wife about the business, in all instances his judgment was followed. He investigated the different properties, made the different purchases, looked after all the matters connected with the stores, signed all checks and notes in his wife's name, and has given his entire time and skill to the business. During all this time Mrs. Maag did nothing about the stores except to make a weekly visit on Saturdays to the stores, to take lunch to her husband, and return home with him after the close of business hours. She was occupied with her household duties.

"While these stores were being carried on, an arrangement was made between Jacob C. Maag, as agent for Mrs. Maag, and Julius Benckenstein, who was a total stranger to Mrs. Maag, pursuant to which sums not to exceed $10,000 were to be advanced by Benckenstein to assist Mrs. Maag in purchasing bankrupt stocks of goods. Under this agreement, money was advanced

from time to time, in sums ranging from $2,000 to $6,000, and with these sums Maag, for his wife, at different times and places, purchased bankrupt stocks of goods. The plan of operation was this: Maag would purchase the stocks, sell from them at retail as long as he deemed it profitable, and either remove the residue to one of the permanent stores of N. A. Maag, or sell the same in bulk or at auction. Such transactions required skill and knowledge of the business. These purchases and sales were made in the name of N. A. Maag, but entirely upon her husband's knowledge and judgment. Her husband always attended the sales at which the different stocks were purchased in person, signed the notes to Benckenstein (using his wife's name) for the money furnished, and arranged the details connected with the different matters.

"It is claimed by the complainants' counsel that the name of N. A. Maag was adopted as a mere cover for Jacob's dealings, and that the agency was a fraudulent device. It appears from the evidence that, on one occasion, Mr. Maag refused to give the first name of his wife. A large part of the bills for goods purchased were made out by mistake to 'Mr. N. A. Maag.' On one occasion, Maag advertised, for the Indianapolis store, as 'Maag, the shoe man.' After the provisional receiver, John B. Harper, appointed in this case, had been discharged, Maag advertised a receiver's sale in the name of 'John B. Harper, Receiver.' Mrs. Maag never had any conversation with any of these Cincinnati firms about her business, never received any letters from them, except such as were delivered at the stores to N. A. Maag. All such letters were destroyed by Mr. Maag, who received them, and he was in the habit of destroying all his business correspondence.

"After making his statement to Mr. Eitel, the local agent for Bradstreet's Commercial Agency, as to Mrs. Maag's financial standing, Maag returned, and told Mr. Eitel that the property was probably not of the value at which it was estimated, which would be a good deal higher than $7,000 or $8,000. Eitel says that Maag used the following language, in substance: 'He said, as there was some old unsettled indebtedness of his own, it might interfere in his making good settlement with his creditors subsequently, if it would appear that Mrs. Maag had accumulated as much as the rating nominally showed; that it might interfere somehow with his making a settlement of his own indebtedness in the future.'

"The evidence further shows that Mrs. Maag is indebted to divers parties in the sum of about $15,000, for goods sold and money loaned to her in the transaction of the business. None of that class of creditors have or hold any kind of claim against Jacob C. Maag for their claims, but, where notes are held, or have been given, her notes alone have been executed, and the accounts for merchandise sold are all against her, and her alone.

"Upon the facts herein stated, and those stated in my previous report, I report and find that the allegation in the bill of complaint that the establishment and carrying on of the business in the name of Mrs. Maag was a mere cover for her husband's dealings, and that the agency was a fraudulent device, is not supported by the evidence."

*Lew Wallace* and *A. W. Hatch*, for complainants.

*D. V. Burns* and *McDonald, Butler & Mason*, for defendants.

WOODS, J. Upon the hearing of the exceptions to the original report, a reference to the master was ordered, the opinion of the court being expressed in this wise:

"The gist of the complaint is that, with fraudulent intent towards his creditors, Maag was carrying on business in the name of his wife, using her name as a colorable device to conceal the true ownership of the business.

This is a question of fact, upon which the master has not found explicitly, nor by satisfactory implication. His conclusion seems to rest on the proposition, of the correctness of which, within proper limits, there can be no doubt, that a wife may do a separate business, upon credit, and may employ her husband to manage that business. But there is this essential qualification: it must be done in good faith; it must really be her business, and her name must not be used for the purpose of enabling him to employ his time and energies in the accumulation of property, to be held beyond the reach of his creditors. If a wife has a business of her own, based upon her own property or her own credit, she may employ her husband to conduct that business; but, if she has nothing with which to do business,—no capital, except the husband's skill and energy, and such credit as is given because the business is to be managed by him,—the situation, to say the least, invokes a close scrutiny into the good faith of the pretense that the business is hers. The case is therefore re-referred to the master to consider, and to report a finding upon the question of fact stated above; counsel to be further heard if they shall desire it."

The question presented upon the last report is one of mixed law and fact, but the evidentiary facts reported are of such character as to admit, as it seems to me, of but one conclusion,—the opposite of that reported. In support of the master, counsel for respondents have cited *Burdge* v. *Bolin*, (Ind.) 6 N. E. Rep. 140; *Cooper* v. *Ham*, 49 Ind. 393; *Scott* v. *Hudson*, 86 Ind. 288; *McLean* v. *Hess*, (Ind.) 7 N. E. Rep. 567; *Hoot* v. *Sorrell*, 11 Ala. 386; *Corning* v. *Fowler*, 24 Iowa, 584, [see *Hamilton* v. *Lightner*, (Iowa,) 5 N. W. Rep. 689;] *White* v. *Hildreth*, 32 Vt. 265; *Webster* v. *Hildreth*, 33 Vt. 457; *Voorhees* v. *Bonesteel*, 16 Wall. 16; *Aldridge* v. *Muirhead*, 101 U. S. 397.

While these cases afford illustrations of the proposition that, under statutes which permit a married woman to have a separate property, to make contracts and to do business as a *feme sole*, she may avail herself of the services and agency of her husband in the conduct of her business, or in the management of her property, "without *necessarily* subjecting it, or the profits arising from his management, to the claims of his creditors," (*Aldridge* v. *Muirhead, supra*,) they are all consistent with, and some of them explicitly state or suggest, the correlative proposition that an insolvent debtor may not use his wife's name as a mere device to cover and keep from his creditors the assets and profits of a mercantile business which is in truth his own.

Counsel for the respondents lay stress upon the testimony of the merchants who furnished the goods with which the Evansville store was opened, to the effect that they gave credit to Mrs. Maag; insisting that she became the owner of the goods so obtained, and thereby was enabled to enter upon a lawful business, in the conduct of which she had a right to use her husband's service and skill. But this is a begging of the question. If she was acting in good faith, the conclusion follows that the business was hers; but if her object was to cover his business under her name, it was not her business, but his, and his creditors are entitled to their remedy accordingly.

The question is not to whom the merchants supposed they were giving credit, but whose in truth was the business. The answer to this question depends, not upon the belief of merchants in respect to whom they gave credit, but upon the conduct and intention of the correspondents Maag. If their design was unlawful as against Maag's prior creditors, the belief or intention of merchants of whom goods were obtained could not affect the character of the business, though it might afford reason for so framing the decree as to protect their interests. It is clear enough, however, that whatever credit was obtained, in so far as it rested upon any personal trust or confidence, was given to him.

The bill is framed upon the theory that the complainants are entitled to reach only whatever surplus there may be after paying the demands of the creditors of this enterprise; and the master has reported the surplus to be ten thousand to fifteen thousand dollars. The property consists of goods in stock, and real estate worth, over incumbrances, $2,000. Considering the probable expenses of a disposition of the property by a receiver, the court estimates the net surplus at $7,500; and if this sum, or the real estate and $5,500, shall be turned over or secured to the complainants within 10 days, it will be deemed a discharge of the complainants' demands, as against the property sought to be reached in this case, and a receiver will not be appointed; but in default thereof a receiver will be appointed; and in the mean time the defendants are enjoined from incumbering, disposing of, or selling any of the property, except in the ordinary course of sales at retail, at fair and customary prices, the proceeds of sales to be deposited in bank, from day to day, and kept there until the further order of the court.