## JAMES TALCOTT

*v.*

## SATTERLEE ARNOLD and ANNA M. ARNOLD.

1. A debtor cannot be compelled to work for his creditors, but if he puts his latent property-earning ability into action, equity will apply any property created to the payment of his debts.

2. If the debtor is a husband, his first duty is to support his family, and he can devote enough of the proceeds of his labor to effect that purpose.

3. Such a debtor can give to his wife in her separate business, or in respect to her separate property, those incidental services which a husband as head of a family would naturally render, without subjecting the business or property of the wife to any liability for his debts.

4. A wife can employ her husband as a servant in the management of her separate business, but a court of equity will closely scrutinize such relation to see whether the employment is *bonâ fide* and whether the business is clearly that of the wife.

5. After the failure of a firm in which a husband was a partner, his wife advanced to him $10,000, with which he supported his family, and paid the expenses of a shop wherein he carried on a series of experiments as an inventor. He caused to be issued, in his wife's name, a number of patents from which large sums of money were realized, and a portion of the proceeds was put in property in the wife's name. All the contracts in the business were made in her name, and the property in which the business was conducted and the bank accounts were also in her name. No contract of employment was proved and the entire course of conduct showed that the husband was master of the business, over whom the wife exercised no control and from whom she expected no account.—*Held*, that the business was the husband's and its proceeds would be applied to the payment of one of the firm debts, subject, however, to a prior lien of the wife for the repayment the money which she had advanced to him.

On final hearing.

*Mr. John B. Vreeland* and *Mr. Theodore Little,* for the complainant.

*Mr. Elwood C. Harris,* for the defendants.

Talcott *v.* Arnold.

REED, V. C.

This bill is filed by a judgment creditor of Satterlee Arnold, for the purpose of reaching certain equitable assets of the said Satterlee Arnold, and to have them applied to the payment of his judgment.

Previous to 1879, Satterlee Arnold was in business in the State of New York, together with one Sarah T. Harden. Their business was the manufacture of knit goods. The complainant was a commission merchant, who received and sold the goods of Arnold & Harden. He was accustomed to advance money upon the goods in his hands for sale.

In 1878 the firm of Arnold & Harden failed in business and made a general assignment for the benefit of its creditors. At that time the complainant had a large amount of the goods of the late firm in his hands, upon which goods he had made large advances of money. He subsequently sold these goods as the opportunity for sale offered, and found that the receipts from the sale of all the goods in his possession were insufficient to repay the advances of money which he had made, together with interest. He brought an action to recover the balance in his favor, in the courts of the State of New York, and on November 21st, 1885, recovered a judgment. Upon that judgment an action was brought in this state, and a new judgment recovered in the supreme court, for the sum of $6,200.53, on September 28th, 1891. Execution was issued and returned unsatisfied.

The bill is filed upon the notion that there are equitable assets of the husband, the legal title to which is now in the name of the wife.

It appears that Satterlee Arnold is an inventor, and his skill has been directed to the invention of improvements upon the sewing machine, for which inventions he has caused a number of patents to be issued. Previous to the time of the failure of his firm in 1879, he had procured patents to be issued to himself, namely, No. 104,532, issued June 21st, 1870 ; No. 119,958, issued October 17th, 1871, and No. 204,938, issued June 18th, 1878. The title to these patents seems to have been passed over to Mrs. Arnold before the failure of the firm.

Since the failure, the husband has had issued to himself, and has then assigned to his wife, the following patents: No. 241,116, issued on May 10th, 1881; Nos. 378,822 and 378,823, issued February 28th, 1888.

He has caused to be issued to his wife the following patents: No. 392,581, on November 13th, 1880; No. 242,038, on May 24th, 1881; No. 249,734, on November 22d, 1881; Nos. 278,-484, 278,485 and 278,486, on May 29th, 1883; No. 311,558, on February 3d, 1885; Nos. 331,106 and 331,108, on February 24th, 1885; No. 313,909, on March 17th, 1885; No. 324,351, on August 18th, 1885; No. 331,107, on November, 24th, 1885; Nos. 378,644 and 378,645, on February 28th, 1888.

So far as appears, nothing substantial was realized from these patents until 1882. On April 1st, 1882, an agreement was entered into between Anna M. Arnold, the wife, and the Norfolk and New Brunswick Hosiery Company, by the terms of which agreement she granted to the company the exclusive right to make, use and sell in the United States the patents granted on June 21st, 1870 (No. 104,532); on May 10th, 1881 (No. 241,-116); and November 22d, 1881 (No. 249,734), as well as any patent which might thereafter be granted to Satterlee Arnold or to Anna Arnold, for any improvement or invention appertaining to "the anchor stitch seam," or "anchor sewing machine trimming and holding devices," or any invention to make knit underwear with the anchor stitch seam and anchor stitch sewing machine trimming.

The company agreed to pay royalties, which, after January 1st, 1883, would together amount to not less than $1,000 a month. These royalties have been, since the date of the agreement, all paid.

On April 2d, 1886, another agreement was made, between Anna M. Arnold, of the first part, and Satterlee Arnold, of the second part, and A. G. Jennings & Sons, of the third part.

By this contract Anna M. Arnold granted to A. G. Jennings & Sons the exclusive right in the United States to manufacture and sell gloves and other hand covering made of fabric other

Talcott v. Arnold.

·than leather, and also the right to license others to do so, under patents numbered 104,532, 241,116, 249,734, 276,484, 278,485, 278,486, 311,558, 313,909, 324,351, 331,106, 331,107, 331,108, and under any patent which might be thereafter issued to Anna M. Arnold in aid of the improvements patented as aforesaid.

The parties of the third part agreed to pay the sum of $25,000 in money. They also agreed to pay one-half of all the royalties which they should receive from others whom they should license, and they guaranteed for five years that these royalties should not be less than $3,000 a year.

Out of the royalties received under the first of these agreements the wife has bought and now owns an unencumbered lot of ground in Verona worth $5,000, and also ten government bonds of $1,000 each. She also owns a $1,000 railroad bond. She is also the owner of stock in the Arnold Sewing Machine Company, which stock is of the nominal value of $75,000, but probably of little real value.

Besides the amounts received from the Norfolk and New Brunswick Hosiery Company, Mr. Satterlee Arnold states that $50,000 or $60,000 has been received under the Jennings contract. Indeed, he says that they had spent in their business $110,000. The proceeds received under the two contracts left after paying the expenses of the business and maintaining the defendants' household seems to have been invested in the property already mentioned.

The question presented for solution is whether all these patents assigned to or issued to Mrs. Arnold, and the contracts made in her name, from which she received a consideration in cash, and from which she has received and is entitled to receive royalties, the stock held by her in the Arnold Sewing Machine Company, and the property which has been purchased by the use of the moneys received from the said contract, belong to the wife free from any liability to answer for this debt against her husband. She, of course, insists that the property is hers, and she puts her right to it upon the ground, first, that the assignments made previous to the failure of her husband's firm, in 1879, although the assignments were voluntary, were neverthe-

less valid, inasmuch as they were not made when he was insolvent, or when he supposed himself upon the verge of insolvency, and that at any rate they were then, and are still, valueless.

In respect to the patents issued to her since 1879, it is secondly insisted that they belong to her by virtue of an agreement made between herself and her husband, by which, in consideration of the sum of $10,000 advanced by her, or to be advanced by her, she purchased the future products of the inventive ability of her husband, and established a separate business of experimentation and of machine-building, and of selling and leasing the said machines.

In respect to the three patents assigned before 1879, it is impossible to conclude from the testimony that they had in themselves any value; nor is there anything in the testimony to show when the insolvency of the firm of Arnold & Harden was first known to the defendant.

The subsequent inventions seem to have been the source from which the profits derived from the contracts and from the business have been mainly received. In regard to the patents issued to Mrs. Arnold, subsequent to 1879, the point upon which the present inquiry must turn is, whether the transaction of which those assignments were a part was a separate business of the wife. The language of section 4 of the Married Woman's act (*Rev. p. 637*) is:

"That the wages and earnings of any married woman, acquired or gained by her after the passing of this act, in any employment, occupation or trade in which she is employed, and which she carries on separately from her husband, and all investments of such wages, earnings, money or property, shall be her sole and separate property, as though she were a single woman."

If the business carried on by the husband in the name of the wife after 1879, can be regarded as her separate business, then by force of this statute all the property invested in it, and all the accretions resulting from its conduct, belong to her. And if the husband in conducting this business was a servant of the wife under a *bona fide* employment, then his services in the business will not subject any portion of such property to the claims of the husband's creditors

The account given by Mrs. Arnold of the circumstances under which these patents were assigned to her, and the future inventions issued to her, and the property where the business was carried on put in her name, is this: She says that about the time of the failure of her husband in 1879, she received the sum of $10,000 from the estate of her uncle, Dr. Vedder, of Schenectady. She and her husband were then living at Troy. She says that they entered into an agreement by which he assigned to her the patents issued and to be issued, in consideration that she should pay him $1,200 a year, and should pay all the shop expenses for the development of these patents, and for all experimenting. She says:

"I was to take all the risks from my private fortune for that purpose, and in consideration of his salary and the amount of this money which I paid out, all these inventions as they became developed through due experimenting and became patented were to be assigned to me."

She says that she thinks that this agreement was put in writing, but she cannot find it.

The husband's account of this arrangement with his wife is substantially the same as hers. He also thinks, but is not sure, that the agreement was put in writing.

I do not think that there was ever any such agreement written and signed by these parties. If it had been executed, that fact would indicate that they were of the opinion that such an agreement was of importance. It is improbable that in such case there would be a doubt in their minds whether it had ever been executed.

Nor do I believe that any single verbal agreement, embodying the points which are now said to have been covered by a written agreement, was entered into.

I have no doubt that the wife received the money mentioned as coming from her deceased uncle's estate. I have no doubt that, with her consent, the money was paid to him as received by her or as needed by him from time to time, and that it went to support the family, including the husband, for two or three years after his insolvency, as well as to pay the shop expenses;

Talcott v. Arnold.

but that there was a distinct agreement that he was to receive a certain sum as salary, I do not think is proven. Nor do I find any foundation in the testimony to support the theory that the business which was carried on from 1879 to the present time, ostensibly in the name of the wife, was, in fact, the business of the wife. The theory of the defendants is that he was the servant, she was the master; that all the business was transacted by him as her servant. Now, the entire history of the business from the year 1879 down, is convincing that she let him have her money whenever he wished it, without a question, and that he put all the patents in her name, for the purpose of securing his property to his family in case of business trouble, while, in fact, he retained as complete control over it as if he was its absolute owner. Every step taken in the business was the offspring of his thought and will alone. In all the transactions it is perfectly obvious that everything was left to him. His wife naturally had but the faintest knowledge of the work in which he was engaged, and exercised no oversight over the conduct of the business.

The bank accounts, it is true, were in her name. It is true also that he drew checks under a power of attorney from her; that the contracts with the Norfolk and New Brunswick Hosiery Company, and with Jennings & Sons, were made in her name; that the property purchased was put in her name; that the property in which the machines were manufactured was in her name. But it seems to me transparent that all this was merely colorable. It was the husband who suggested the agency, who settled the terms of the contracts, who received and deposited the money arising from them, and who spent it, with no expectation, on his part or on her part, that he would ever be called upon to account to her for its receipt or expenditure. He kept no books of account, except of the most meagre and partial kind, of the receipts and the expenses of the business. The wife never asked for an accounting and never expected any, and he knew that she never expected any.

The organization of the Arnold Sewing Machine Company and its operation, are illustrations of his absolute control of

affairs. The company was organized in this way: The property in which the husband had conducted his experimentation was in her name. The Arnold Sewing Machine Company was organized, and $75,000 worth of its stock was given to the wife, ostensibly for this property, which she turned over to the corporation. The rest of the stock seems to have been held by friends of the Arnolds, the husband holding one share. The husband was made president and manager, and is still such. His control of the business of the corporation has been absolute. No meetings of directors seem to have been held. In fact, he cannot tell who the present directors are. He has been the president, the manager, the board of directors and the whole corporation.

The facts of the case, as I have found them, are very much in line with those in *Glidden, Murphin & Co. et al.* v. *Taylor et al.,* *16 Ohio St. 509.* In that case the husband manufactured in the name of his wife for years. There was no formal agreement between the husband and wife concerning his services, or as to the disposition of the property of the business. As her agent and trustee, he received the proceeds and supported himself and his family therewith, and spent what money he desired, and with the surplus purchased, in the name of his wife, a dwelling-house and lot. In the prosecution of the business he had entire control. The property thus accumulated was held to be subject to the claims of his creditors.

But it is strongly insisted that all the property which is now alleged to be equitable assets of the husband is the outcome of his inventive ability, and that he had the right to give his talent to his wife, without impressing upon the property produced by it, any liability for his own debts. It is said that a man is not the slave of his creditors, and that he is not bound to devote his personal labor or mental ability to the payment of his debts. This statement is undoubtedly true. While there is a moral duty to pay debts, yet there is no method of physical coercion by which the debtor can be compelled by any judicial proceeding to do so. But the question here is, not whether the debtor can be compelled to work for his creditors, but whether if he

does put into action his latent ability to earn money, and it produces property, the property can be reached and applied to the payment of his debts. In *Abbey* v. *Deyo, 44 N. Y. 344,* Mr. Commissioner Ward Hunt, in his opinion, took the ground that the debtor could give his time and his talents to whomsoever he pleased. Therefore it followed that, however great his talents were, if he chose to exercise them for the benefit of his wife, the product was hers.

In *Voorhees* v. *Bonesteel, 16 Wall. 31,* the supreme court of the United States, on appeal from the circuit court of the eastern district of New York, followed the cases in the state courts in holding that a wife could employ her husband to manage her business, and that the application of a portion of the income of the wife's separate property to the support of the husband would not impair the title of the wife.

In *Aldridge* v. *Muirhead, 101 U. S. 397,* on appeal from the circuit court for the district of New Jersey, Chief-Justice Waite held that the fact that the husband had rendered services in employing the wife's capital in the purchase of lands would not invalidate her title thereto, if his services were devoted to her separate property. These cases were cited with approval by Vice-Chancellor Van Fleet, in his opinion in *Tresch* v. *Wertz, 7 Stew. Eq. 124.* The right of a wife to employ her husband in her grocery business, in consideration of his clothes and board, was upheld by Vice-Chancellor Bird in *Kutcher* v. *Williams, 13 Stew. Eq. 436.*

I do not understand, however, that in any case decided in the courts of this state it has been held that the right of a husband to give away the proceeds of his labor or his talents as he pleases, free from the demands of his creditors, has been asserted in the unrestricted language used in the opinion in *Abbey* v. *Deyo, supra.*

It is to be observed that in all the cases so far mentioned the services of the husband were rendered in a separate business, or upon the separate property of the wife.

There is no instance, within my knowledge, where a husband has said to his wife, "I am going to work and I give you my

Talcott v. Arnold.

labor and its fruits," that a court has held that the gift of the property creating potentiality of the husband carries to the donee a title to the property created, free from all liability to pay the husband's debts.

As has already been remarked, it is of course true that a court cannot exert any authority over a debtor to make him work with his hands or his intellect for his creditors; and even when a debtor has turned his ability into value by the exertion of his talent or the exercise of his hands, it is, in a degree, free from liability if the debtor is a husband. Such a debtor undoubtedly possesses the right to labor for the support of his family and the maintenance of his children. This is a duty, and so long as the result of his labor does not exceed an amount sufficient to properly maintain and educate his family in their walk in life, it cannot be reached. *Phillips* v. *Hall, 160 Pa. St. 60 ; Seay* v. *Hesse, 123 Mo. 450 ; Bump Fraud. Conv. ¶ 25.*

A husband can render those incidental services which the head of the family generally performs, and can give his wife the benefit of his experience and skill in the transaction of her separate business and in the management of her separate property. *Tresch* v. *Wertz, supra.*

But there is no case in our courts which has upheld the right of the husband to give to his wife unrestrictedly all the profits of his labor or his talent. Instead of upholding the right of the husband to this extent the courts have asserted a different rule. In *National Bank of the Metropolis* v. *Sprague, 5 C. E. Gr. 13,* Chancellor Runyon held that while a husband had the right to give to his wife her earnings when she carried on her separate business, with his assistance, with her own means and on her own account, yet when the labor and skill of the husband had united with those of the wife, the business would be considered as the husband's and the proceeds would not be protected from his creditors.

So, in *Quidort's Administrator* v. *Pergeaux, 3 C. E. Gr. 472,* it was held that the husband could not give to his wife his earnings.

It is true that at the date of these decisions paragraph 3 of the

Talcott *v.* Arnold.

present Married Woman's act (*Rev. p. 637*) had not been enacted. That section became operative in 1874.

This statute shields all the earnings of the wife, derived from her separate business, from her husband's creditors. Under this statute the relations of the husband and his wife are exactly the same as they were before its enactment, whenever the husband had abandoned, in favor of his wife, all claim to her earnings. In both of the cases cited the husband had done this, so far as he was able. The ability of the husband to confer all the benefit resulting from his labor and skill, was not affected at all by the act, nor does the act modify or annul the force of the previous decisions touching that point. Those cases represent the true doctrine. No debtor can obtain a clearance from all the claims of his creditors except by virtue of a bankrupt law, nor can he voluntarily turn over all the proceeds of his labors or his ability by a gift which precedes or follows the accretion of such property, so long as he has creditors.

My conclusions are that the business carried on in the name of Mrs. Arnold was not her separate business but was, in fact, the business of her husband.

The profits derived from it, and the property into which the profits have been put, are liable as equitable assets of the husband, to be applied to the payment of the complainant's judgment.

I am of the opinion, however, that Mrs. Arnold has a superior equitable lien upon all this property as security for the repayment to her of all the money advanced to the husband, together with interest upon it.

One object which Mr. Arnold had in mind, when he caused the patents to be assigned to or issued in the name of the wife, was security to her. This much of the transaction she must have known, although she knew little beyond this.

The case is one where the legal titles held by her should be set aside upon equitable terms, and the wife's equity in the property, to the degree already stated, should be protected.

I will frame the details of the decree on application of the counsel of the complainant, upon notice to the counsel of the defendants.