Coyne *v.* Sayre.

PATRICK COYNE et ux. et al., appellants,

*v.*

MARCUS SAYRE, respondent.

1. In an action by creditor's bill to subject lands standing in the name of the wife to a judgment obtained against her husband when he failed in business about eighteen years before, on the ground that the lands were paid for partly by moneys derived from the profits of a business carried on by the husband and a son as partners, the complainant, to establish his cause, relied mainly upon the testimony of the husband, wife and son, supplemented by some contracts of the firm for work. They testified that after the husband's failure he worked with another in partnership and later with his eldest son, who is a minor, and that upon the son becoming of age, his mother, with the aid of money from her brother, entered into the partnership in question with the son, without any change in the partnership named, the father retiring and working for the firm for wages. The written contracts produced were signed in the firm name and recited that the firm was composed of the father and son. The court below, relying largely upon the written contracts, determined that the father was the partner throughout, and sustained the bill.—*Held*, on appeal, that as the written contracts were not brought to the knowledge of the wife in any way, they were as to her *res inter alios acta*, and were erroneously admitted in evidence against her; *held, also*, that the burden of proof rests upon the creditor who assails a transfer for fraud, and that with these contracts eliminated from the evidence, the respondent failed to establish his case by a preponderance of proof.

2. It also appeared in the cause that the wife, in a few years after her husband's failure, purchased a lot and erected thereon a dwelling-house, paying for the same partly by money raised thereon by mortgage and partly by her separate earnings and the work and earnings of her three minor sons, and that the husband contributed thereto by his own work and earnings as a journeyman. It further appeared that the wife placed her deed promptly upon record and occupied the house with her family for about twelve years, when she made sale of this property and used the proceeds thereof, after satisfying her mortgage, in part payment for the properties attacked by the respondent's bill, during which time, a period of fifteen years, the judgment creditor had not challenged her exclusive right to said house and lot and the proceeds of the sale thereof until the filing of this bill, although he had lived during this period in the same city where the wife resided, and knew or ought to have known of the purchase and how the consideration thereof was paid.—*Held*, on the appeal, that the wife's appropriation to the purchase and improvement of her lot, of the work and earnings of her minor children with the husband's

Coyne *v.* Sayre.

consent, and of the labor and services of the husband, so long as it did not appear that the latter were beyond the amount necessary for the reasonable support of his family, was not fraudulent as against creditors; *held, also,* that even if the proceeds of this sale or part thereof would have been within the reach of a diligent creditor, still respondent's claim thereto would fail by reason of laches.

On appeal from a decree advised by Vice-Chancellor Pitney, whose opinion is reported in *Sayre* v. *Coyne, 33 Atl. Rep. 300.*

*Messrs. Colie & Swayze,* for the appellants.

*Mr. Robert H. McCarter* and *Mr. Frederick T. Johnson,* for the respondent.

The opinion of the court was delivered by

HENDRICKSON, J.

This bill was filed by the respondent, a judgment creditor of Patrick Coyne, one of the appellants, seeking to charge therewith two certain houses and lots, situate respectively upon Day and Garfield streets, in the city of Orange, in this state, the title to which stood in the name of one of the appellants, Mary A. Coyne, wife of the judgment debtor, upon the grounds as alleged and charged in the bill that the lands were purchased and the buildings erected thereon with the money of the judgment debtor, subsequent to the recovery of the judgment and while it was still unsatisfied, and that the latter procured said lands to be conveyed to his said wife for the purpose of concealing his said property and defrauding the respondent and preventing his recovery of his said judgment. The joint and several answer of Patrick Coyne and Mary A. Coyne, which were called for in the bill to be made without oath, deny the charges of said bill and declare that the consideration money for the purchase of said lots and the money expended upon the buildings proceeded not from the judgment debtor, but from the personal resources and moneys of the wife.

Under the issue thus made the burden of proof was upon the

respondent not only to establish the charges and allegations of his bill, but to establish every circumstance relied upon to support the same.

The evidence offered by the respondent in support of his case, in addition to the proof of his judgment, consisted chiefly of the testimony of Charles F. Coyne, a son of the debtor, and the testimony of said Charles F., Patrick and Mrs. Coyne, taken before a supreme court commissioner upon an examination of the judgment debtor by supplementary proceedings under the Execution act, and certain building contracts on file in the clerk's office of Essex county.

The evidence above submitted established the following facts, which were not disputed :

Patrick Coyne was a mason by trade, residing in the city of Orange, and took contracts for buildings, and was the owner of some property upon which the respondent held a mortgage. In addition to the mortgage the respondent, on October 9th, 1876, recovered in the supreme court of this state the judgment above named, for $610.84, against the said Patrick Coyne, and levied the same on his said property. Foreclosure proceedings followed and the property was sold by the sheriff, but nothing was realized out of the sale upon the judgment.

The bill filed insists and charges that the moneys which went into the houses and lots above named, the title to which is in Mrs. Coyne, were derived either wholly or mainly from the profits of P. Coyne & Company, a firm of masons composed, as it alleges, of the said Patrick Coyne and his son, Charles F. Coyne, and the learned vice-chancellor, in advising the decree in favor of the respondent, from which this appeal is taken, bases his action upon finding these charges of the bill to be true. His words are: "So that I conclude that the proofs show satisfactorily enough that both of these properties, so far as they were paid for, were paid for with the earnings of the firm of P. Coyne & Company, of which one-half belonged to Patrick Coyne."

It is insisted on behalf of the appellant Mrs. Coyne that the proofs do not sustain this conclusion, and that the building contracts, which are largely relied on by the learned vice-chancellor

to support his conclusions, and which were objected to, were not legal evidence as against her.    We are therefore required to review the facts bearing upon the points in controversy.

It appears that the firm of P. Coyne & Company had no existence whatever, and that Patrick Coyne was not a partner with anyone, at or before the time of the recovery of the respondent's judgment.    Upon this point the pleadings and proofs all agree, although, through some inadvertence, the syllabus of the vice-chancellor's opinion assumes the contrary to be the fact.

The debt upon which the judgment was founded was the individual indebtedness of Patrick Coyne, contracted long before the purchase of the properties in question.

The Day street property above named was conveyed to Mary A. Coyne by deed dated March 19th, 1887, the consideration being $1,050, of which $550 was paid in cash, the balance remaining on mortgage.    A dwelling was afterwards erected on this lot at an expense of about $3,000.

In the winter of 1891 a small lot was added to the Day street property, at an expense of $450, which was paid in cash.    The Garfield street lot was conveyed to Mary A. Coyne, January 28th, 1891, at a consideration of $625, which was paid in cash. A dwelling was also erected on this lot at an expense of about $3,000.    Add to the estimated cost of the houses the cost of the lots, and we find the properties in 1894 represented, all told, an expenditure of about $7,675.    Mrs. Coyne insisted that a large part of this money was given or loaned to her, in different sums, by her brother, James Fallon, a Brooklyn plumber, and that he also advanced moneys to her to aid her in the business of P. Coyne & Company, in which she claims to have become a partner with her son, Charles F. Coyne, upon his coming of age in 1882, and in this her brother confirmed her.    The learned vice-chancellor, while not giving full credit to all their declarations as to these moneys claimed to be loaned to his sister by Mr. Fallon, evidently thought that some part of said moneys had been so advanced, as the following language in the opinion seems to indicate: "The judgment, principal and interest in this case, will amount to less than $1,500, and the property is of ample

45

value to pay that sum, and also all that I am able to believe can be honestly due James Fallon on his mortgages."

The evidence of the respondent, aside from some building contracts offered in evidence, shows that Patrick Coyne, after his failure in business in 1876, worked at his trade in Orange for a short time, and later entered into partnership with one Beck, under the firm name of P. Coyne & Company. Soon afterwards, it does not appear how soon, Beck died, and thereafter Patrick Coyne took some contracts for buildings in the name of P. Coyne & Company, until his eldest son, Charles F. Coyne, came of age in 1882, when it seems the son became a partner in the business; whether with his father, Patrick Coyne, or with his mother, Mary A. Coyne, is the principal matter in dispute in this case and upon which it largely turns.

Before taking up that question in detail it will be well to refer to another matter which was developed by the answer of Mary A. Coyne and her husband and by their evidence at the hearing, and that is this: Shortly after her husband's failure, Mrs. Coyne contracted with one Elias M. Condit for the purchase of a lot of ground on Lakeside avenue, in said city of Orange, and in pursuance of that contract, said Condit and wife, by deed dated February 19th, 1878, and recorded on June 17th following, in the Essex register's office, for a consideration of $500, conveyed said Lakeside avenue lot to Mary A. Coyne. Upon this lot a dwelling-house was erected soon after, and the Coyne family moved into it and resided there for a number of years. About the year 1890, the undisputed evidence is that Mrs. Coyne made a sale of this property for $2,000, and, after deducting a mortgage thereon of $700, realized the sum of $1,300, which went into the Day street and Garfield street properties.

Presumably, in the absence of any proof to the contrary, this money was the property of the wife, and for the respondent to reach this part of the consideration of the real estate under attack, he must satisfy the court that it belonged to or was held in trust for Patrick Coyne.

The learned vice-chancellor seems to have reached a conclusion to that effect, concerning the proceeds of the sale of the

Lakeside avenue property, since no reservation of this contribution to the Day street and Garfield street properties, in favor of Mrs. Coyne, is made in the decree. But I think a fair examination of the testimony shows that the vice-chancellor erred in his conclusion upon this branch of the case. There is no evidence to show that Patrick Coyne contributed any money toward the purchase or improvement of the Lakeside avenue property. The opinion of the vice-chancellor justly says upon this point: "It is admitted that this $500 (referring to the consideration of the deed) was paid by mason work done on other buildings for Mr. Condit, and that the house was erected the same way." The only witnesses on this subject were Mrs. Coyne and her husband.

Their testimony was given sixteen years after the transaction, and was to the effect that they were unable to recollect all the particulars, but that Mr. Condit received his pay for the lot in work by Patrick Coyne and the three sons, who were masons, the oldest then eighteen years of age; that at and about that time the mother received the wages of her three sons; that the father did not, at that time, earn enough money to make a living for the family, but paid his earnings into the hands of his wife for that purpose; that the carpenter work was done by Mr. Ingling on a contract, and that he accepted the price in other work done by her sons, and in small sums paid by her son Charles.

It did not appear whether Mr. Condit and Mr. Ingling were still living at the time of the hearing, and it does not appear that the respondent made any effort to produce those persons as witnesses in the case, and, as a matter of fact, no witnesses were called by respondent to meet the testimony of Mr. and Mrs. Coyne as to the circumstances relating to the purchase and improvement of the Lakeside avenue property by Mrs. Coyne.

The evidence is that Mrs. Coyne alone contracted with Mr. Condit for this Lakeside avenue property, and presumably the mortgage of $700 was one negotiated for and placed upon the lot by her to raise money to put in the building. It appears also beyond dispute that, after her husband's failure and up to

and including the time of her acquiring and improving the Lakeside avenue property, Mrs. Coyne took boarders and raised chickens, the proceeds of which she used to supplement her husband's insufficient support; and she says these earnings of hers, with the wages of her husband and of her three boys, who worked at mason work and plumbing, all of which were paid to her, were applied, after paying the expenses of the family, five in number, toward the erection of her Lakeside avenue home.

The evidence fails to show that the earnings of Patrick Coyne during the period named were more than sufficient for the ordinary support of his family. The mere fact, then, that the mother, with the consent of the father, which seems to be established, took the benefit of the labor of her minor children and of her own savings from the keeping of boarders and other small undertakings of hers in acquiring and improving the Lakeside avenue property, even before the passage of the amended Married Woman's act of 1874, does not create an equity in such property in favor of the creditors of the husband. *Johnson* v. *Vail, 1 McCart. 423; Peterson* v. *Mulford, 7 Vr. 481.*

The act of 1874 (*Gen. Stat. p. 2013 § 4*) which secures to a married woman her own earnings in any employment carried on separately from her husband and her investments thereof, would seem to leave no doubt that, in this case, the Lakeside avenue property of Mrs. Coyne was beyond the reach of the respondent's claim. But even granting that a portion of the earnings of Patrick Coyne had gone into this property as a gift to his wife, which could be reached by a diligent creditor, still there is another aspect of this part of the case from which, as it appears to me, the relief asked for as against the proceeds of that property should be denied, and that is this: Mrs. Coyne took her deed for this lot in 1878, and promptly placed the same upon record and proceeded forthwith, partly by borrowed capital, to erect thereon a dwelling-house and moved into it with her husband and children. The judgment creditor, it seems, resided in the same city, and was well acquainted with the Coyne family, and was, it will be presumed, under the circumstances, in the absence of evidence to the contrary, conversant with this prop-

erty transaction. And yet, according to the evidence, he stood by while Mrs. Coyne completed the erection of this home and during her occupation of it for fourteen or fifteen years, and until, as we may justly assume, on the faith that this was her undisputed property, she is induced to sell this and invest the proceeds of the sale in other real estate, to an extent that caused her to assume additional financial burdens and obligations, in the purchase and improvement of the same, before making any effort to challenge her exclusive right thereto. This view is sustained by the authorities. When a complainant, under such circumstances, has, by his delay, induced or suffered a defendant to incur expense or enter into engagements of a burdensome character, a court of equity will consider that the complainant is guilty of such laches as precludes him from obtaining relief. *12 Am. & Eng. Encycl. L. 549.* Other authorities in point are *Bump Fraud. Conv. 573,* and notes; *Degrauw* v. *Mechan, 3 'Dick. Ch. Rep. 219; Aldridge* v. *Muirhead, 101 U. S. 397.*

As before stated, there is no question but that the $1,300, the proceeds of sale of the Lakeside avenue property, was expended by Mrs. Coyne in the purchase or improvement of the properties sought to be reached by the bill, and, from what has been said, it follows that the *bona fides* of the transaction, so far as the rights of Mrs. Coyne are concerned, has to that extent been established. It seems to be clear from the testimony also that Mrs. Coyne was, in some degree, aided in the purchase and improvement of these properties by moneys furnished by her brother, Mr. Fallon, and it seems also to be clear that some of the money so used by her came from the bank account of P. Coyne & Company.

But as to whether the moneys that were paid on the properties in question, by the checks of P. Coyne & Company, were from the profits of the partnership business or from the private funds of Mrs. Coyne, advanced to her by her brother and from the private earnings of herself and children, which she says she deposited, through her son Charles, with the account of P. Coyne & Company, there is conflict in the testimony.

But the decree advised in this case is based upon the assump-

tion that it is established by the proofs that Patrick Coyne was a partner with his son, Charles F. Coyne, at this time, trading under said firm name, and that a sufficient part of Patrick's share of the profits of the firm was paid upon the said properties or the improvements made thereon to pay and satisfy the respondent's judgment.

This brings us back to the initial question—Was Patrick Coyne, and not Mary A. Coyne, the partner with their son, Charles F. Coyne, after the latter became of age in 1882?

If the respondent has failed to establish the affirmative of this question, then his cause necessarily fails and no inquiry need be made as to what part or proportion of the property was derived from the profits of P. Coyne & Company. The testimony of the Coynes was to the effect that, upon Charles F. Coyne becoming of age, the partnership was formed between Mary A. Coyne, the mother, and Charles F. Coyne, the son, to trade under the old firm name of P. Coyne & Company; that the latter had saved $122 which he put into the business, and that Mary A. Coyne received from her brother, James Fallon, from time to time, several sums, amounting to from one to two thousand dollars, which went into the business. These witnesses all testified that Patrick was not a partner then or afterwards, and took no part of the profits, but that he worked for the firm for wages, the larger part of which, from week to week, he gave to his wife toward the support of his family; that Mrs. Coyne still took boarders and deposited her surplus earnings with her son Charles, to go into the firm account.

Mr. Fallon also, under oath, corroborated his sister as to advancing her these sums of money. The only evidence offered, tending to contradict the testimony in any way, was that of certain building contracts made with different builders by the firm of P. Coyne & Company. These contracts described the partners as Patrick Coyne and Charles F. Coyne, or P. Coyne and C. Coyne, trading as P. Coyne & Company, but in every instance save one, the signature, P. Coyne & Company, was attached thereto by Charles F. Coyne, and in the one exceptional instance there was evidence tending to prove that Patrick Coyne signed

his own name at the request of the builder, who insisted on the individual names.

There was no evidence that Mrs. Coyne had any knowledge of these written contracts, either as to how they were written, signed or otherwise, or that she had given any authority to any one to sign written contracts on her behalf.

The evidence in the cause was taken before the late Vice-Chancellor Van Fleet, and when the contracts above referred to were offered in evidence, objection was made to their admission, on the ground that they could not bind Mrs. Coyne.

They were admitted by the late vice-chancellor, subject, as he stated, to the objection of appellants' counsel, the court remarking that, perhaps, the complainant could be required to prove who P. Coyne & Company was.

The learned vice-chancellor who advised the decree, in his opinion notes the objection thus made to the admission of this documentary evidence, and says, " but it is clearly competent to contradict Charles and Patrick, and I think it is also competent as the contemporaneous acts of the parties." We think the vice-chancellor erred in thus considering and giving effect to this evidence as against Mrs. Coyne.

The principle upon which such evidence should be excluded is illustrated by what the late vice-chancellor said at the hearing, in overruling the offer, by the respondent's counsel, of the depositions of Charles F. Coyne, taken in another matter, to be used as admissions of Charles F. Coyne against Mrs. Coyne. The court's remark was, " Now, you are going on the theory that Mrs. Coyne was a partner, but that is the very thing you deny. Now, you cannot say she is a partner, for the purpose of getting these admissions in, and then, after getting them in, turn around and say, Oh, she is not a partner."

It is alike inconsistent to claim, in the absence of any evidence connecting Mrs. Coyne personally with these contracts, that she is a partner, for the purpose of binding her, by the acts of Charles F. Coyne, one of the partners, with regard to these contracts, and then use them as evidence tending to show that Mrs. Coyne was not a partner.

Even if the offer in question had been made with the purpose of binding Mrs. Coyne to some obligation or contract as one of the partners, it is well settled that, before the acts or admissions of one who was an admitted partner could be used· to charge her, evidence must first be given to satisfy the court that such partnership existed between the parties named. *Flannagan* v. *Champion, 1 Gr. Ch. 51; Abb. Tr. Ev. 209; 1 Greenl. Ev. 177.*

If this be the law as to admissions of one partner offered to bind another person as a copartner, it is obvious that when the acts and admissions of one partner are offered to prove that a certain other·person is not a partner at all in the alleged partnership, such offer is entirely without support in authority, and at variance with the established legal maxim, *"Res inter alios acta alteri nocere non debit."* Upon the same general principle, the depositions of Patrick Coyne and Charles F. Coyne, taken as they were in a different proceeding, and offered in evidence in the case as the admissions of the witnesses named, were inadmissible as evidence against Mrs. Coyne, and as such should have been excluded.

Arguing from his view of the facts of the case as stated in the opinion, the vice-chancellor says : " I conclude that the written contracts speak the truth, and that Patrick Coyne and Charles Coyne, in name and in fact, composed the firm and were entitled to its earnings " &c.

But the written contracts being excluded as above, it is quite clear that the remaining evidence fails to sustain this conclusion.

It may be further observed that among the facts and circumstances indicated by the vice-chancellor as influencing· his mind toward this conclusion were these : That Patrick had conducted the business under the firm name of P. Coyne & Company successfully, from the date of his failure up to the date of the commencement of the alleged partnership ; that there was no external change in the partnership name and that Patrick continued to take an active part in it and allowed his name to be used in the written contracts as one of the partners, and that no reason is shown why he should abandon the partnership and work for it as a journeyman.   But I think it may justly be said in answer

that the parol evidence is all to the effect that during the period named Patrick Coyne did not do a large and successful business, and in fact did not earn more than sufficient to support his family, if that. The contracts offered during that period of five years aggregate but $2,817 for labor and materials, the profits upon which would of course be considerably less than that. According to the evidence, upon the formation of the new partnership as alleged in 1882, there was a purchase made of a team and wagon to be used in the business, thus indicating an enlarged effort in its prosecution.

Nor do I think it so strange that a change should be made in the firm by Mrs. Coyne becoming the partner with her son, for Patrick and his wife must have known that the former had this judgment of the respondent standing against him since his failure, so that he could not himself engage extensively in business without its being subject to seizure by the sheriff at any moment. The absence of any writings is also commented on as an indication that there was in fact no change in the partnership.

But there ought not, as it seems to me, to be too much significance attached to that circumstance, for I have observed that business transactions between kindred, though entirely *bona fide* in character, are often very carelessly done and with little regard to formal or legal requirements.

It is also suggested in the opinion, as a circumstance adverse to the interests of the appellant Mrs. Coyne, that she did not produce the checks and the bank account to corroborate her own evidence as to money she deposited in the firm name, and payments thereout made in the purchase or improvement of the properties, but it seems to me that in this case it was rather the duty of the respondent, who had the burden of proof, to have called for the production of these checks, if in existence, or to have caused the books of the bank to be produced if they in any way tended to contradict her evidence, and that the failure to do so, unexplained, weakens the case of the respondent.

The bill charges fraud upon the defendants, and it is a well-settled principle, both at law and in equity, that fraud is never presumed and that the burden of proof rests upon the creditors

whenever they assail a transfer for fraud.   *Bump Fraud. Conv.* § *611.*

After a careful reading of the evidence, and eliminating therefrom the written contracts and other proofs thus erroneously admitted, I fail to find that the charges of fraud set forth in the complainant's bill as against the defendants, Patrick Coyne and wife, are established by the preponderance of the evidence. Having reached a determination adverse to the claim of the judgment creditor as against the real estate in question, it becomes of no importance to discuss the question of the *bona fides* of the Fallon mortgages thereon, either in whole or in part. The result is that the decree below must be reversed and the bill dismissed.

*For reversal* — THE CHIEF-JUSTICE, DIXON, GARRISON, GUMMERE, LIPPINCOTT, LUDLOW, MAGIE, VAN SYCKEL, BARKALOW, BOGERT, DAYTON, HENDRICKSON, NIXON—13.

*For affirmance*—None.