VOORHEES *v.* BONESTEEL AND WIFE.

1. Affirmative relief will not be granted in equity upon the ground of fraud unless it be made a distinct allegation in the bill.
2. Nor will a trust alleged in a bill to exist, be considered as proved when every material allegation of the bill in that behalf is distinctly denied in the answer; and the proofs, instead of being sufficient to overcome the answer, afford satisfactory grounds for holding that there was no trust in the case.
3. Under the laws of New York, a married woman may manage her separate property, through the agency of her husband, without subjecting it to the claims of his creditors; and when he has no interest in the business, the application of a portion of the income to his support will not impair her title to the property.

APPEAL from the decree of the Circuit Court for the Southern District of New York, dismissing a bill filed by

one Voorhees, assignee in bankruptcy of John Bonesteel, against the said Bonesteel and Sophia his wife, to get possession of 1145 shares of the stock of the Nicolson Pavement Company, of Brooklyn, which, though standing in the name of the wife, he, the assignee, asserted were held in fact and truth for the husband, but which the husband and wife asserted were not so held, but belonged, on the contrary, to the wife alone, and were her separate property.

The case was thus:

John Bonesteel, above named, at first resident in Chicago and afterwards in New York, a man of active and scheming turn of mind, but always embarrassed, and Mr. S. B. Chittenden, also first of Chicago but afterwards of Brooklyn, a man of property and standing in that place, the second largest taxpayer in the place and editing or controlling the editorship of the Brooklyn *Union*, an influential paper there, had married in 1848, or thereabouts, each of them, a daughter of one Hartwell, a person of property in Bridgeport. At the date mentioned, Bonesteel was engaged in business in Chicago, and dealing not unfrequently with his brother-in-law, Chittenden, who was also in business there, but who appears to have always rather distrusted Bonesteel's capacity for the practical management of affairs. In 1853, or 1854, said Mr. Chittenden, in giving testimony in the matter, "It became apparent to me that he was insolvent, and I told his wife's father that I thought so. In 1855, perhaps, I told him he had better do no business with me. From that time to 1859 Mr. Hartwell very frequently advanced money to him; as often as twice a year. When he came to New York to pay his debts he would advance money to him to help him through the season. In 1859 he failed and made an assignment. A year or two later, I think in 1863, he came to New York to reside, Mr. Hartwell furnishing him money to pay his board. He had no occupation. After he had been there boarding, Mr. Hartwell furnishing his daughter money for the support of the family, a year or longer, he began to do a brokerage dry goods business. He came and bought goods of me. I knew that he was bankrupt, and we

never delivered goods until he paid for them. He was my brother-in-law, but I refused to allow my firm to sell him goods on any other condition, because I thought somebody might attach them. I think, within the last year, while pursuing this business, his father-in-law wrote me a letter stating that he had concluded, ' at the request of John's wife, to advance him another $3000,' and he ordered me to pay the money over to him. I paid him the $3000, but I wrote to Mr. Hartwell that he would lose it; that I didn't think Mr. Bonesteel would ever be able to return it. He said, ' *I do it for my daughter.*' "

In this condition of things, about the year 1865, one Taylor, who had also been a resident of Chicago, but had now come to reside in New York—had purchased from Samuel Nicolson, the patentee of that sort of pavement called by his name, a license to furnish it to certain places, including New York and Brooklyn, in the East, and was now seeking to get the pavement into general public use. He gave this account of things:

" When I first came to New York, I was an entire stranger in the city. Being intimately acquainted with Mr. Bonesteel, and Mrs. Bonesteel, too, and desiring to get the influence of her and her husband, and other influential parties, I made up my mind to give Mrs. Bonesteel one-*third* interest of Brooklyn, *at that time;* being satisfied that it was for my interest to give it to her. I had a conversation with her, in the end of June or beginning of July, 1866. The substance of the conversation was: Mr. Bonesteel had been exerting himself with me, going round and seeing parties for a month or more, in reference to introducing the pavement. She felt uneasy about his neglecting his own business, and running round for me about ' the Nicolson,' which, she was afraid, would amount to nothing. I impressed upon her that it would be a good thing, provided I could get certain influences—the influence of Mr. Chittenden, the only person whose influence was wanted—to help me along. She stated that she had let her husband have some money to engage in business, and that by his neglecting *that* he would lose what he had, and not make anything out of the pavement. I told her I was satisfied that *she* would make four times as

much out of the pavement as Bonesteel would in trafficking in goods."

Bonesteel, the bankrupt, gave an account of things not dissimilar, as follows:

" Mr. Taylor was a stranger in the city, and was anxious to introduce the pavement here, and, at the same time, had a large contract at Elmira, New York; and, knowing that I had many acquaintances and friends here who could be of assistance to me in the obtaining of contracts for introducing the pavement, wished me to secure them; showing me, at the same time, that there was a good profit in the work; that if I would devote and give my time to it, I should have all the profit, over $1000, realized therefrom. . . . He was constantly coming to me, at my place of business, and taking up my time in calling upon influential parties and property owners: I said to him that my wife had furnished to me several thousand dollars in money to use in the purchase and selling of merchandise, to assist in the making of money to maintain the family, and that I did not feel it was right or proper, under the circumstances, to give up so much of my time. I called his attention frequently to his taking so much of my time. *He said she should not be made the sufferer by the misappropriation of my time."*

The account given by Mr. Chittenden, as appearing in interrogatories put to him and answers received, was thus:

Question. When did you first hear of the Nicolson pavement in connection with Brooklyn?

Answer. Some time in the year 1866, standing in the subtreasury building, I saw Mr. Bonesteel. I asked him what he was about. He spoke of a new pavement. I asked him where the pavement came from, and what the merits of it were. He told me about it, and I asked him to come to my office and talk to me about it. After hearing his story, I said, "John, you were always wild. I don't believe in it, but I will investigate it." I sent to Chicago and Milwaukee, wrote to gentlemen to whom he referred me, and made inquiries.

Q. Did you have any interview with Mrs. Bonesteel on the subject?

A. I was in the habit of visiting her constantly, and talked with her about it frequently.

Q. What did she propose to you about it, if anything?

A. I don't know that she proposed absolutely anything to me in the early part of it.

Q. At any time, about introducing it?

A. According to my recollection, I said, if I can ascertain that this is a good pavement for Brooklyn, I will do all I can for it; and I also said, if I do it, Mr. Taylor ought to give you at least a half interest in it.

Q. Had she then expressed a desire to have you aid her in the matter?

A. She at first expressed a strong disinclination to have her husband have anything to do with it, because she had no faith in it.

Q. Later, was her opinion changed?

A. When I became satisfied it was a good pavement, she was very glad to have my assistance.

Q. You did finally assist in introducing the pavement into this city?

A. I laid it in front of my own property, and in front of my neighbor's property, both sides of the street, at my own expense.

Q. Why?

A. Because I believed that it was the best pavement that could be possibly devised for Brooklyn.

Q. How, in your mind, was that to benefit Mrs. Bonesteel?

A. I told her husband and told her that, in consideration of the advocacy which I could give it, and which the newspaper which I had the management of could give—as it was a good pavement—the least he could do, if he was a reasonable man, was to give her half. I urged and insisted on this. But I did not make this a condition of my advocating the pavement. I had a double object: I knew it was a good pavement and I desired to benefit Mrs. Bonesteel.

Q. You knew she was embarrassed somewhat by her husband's difficulties?

A. I knew perfectly well that her family were living at the expense of her father.

Q. You knew that they were living at her father's house?

A. In her father's house, and I had reason to suppose that he had never returned any of the money that he had received from

him many years, which I think he once said to me had amounted to $30,000.

Q. Did Mrs. Bonesteel confer all along with you as her adviser in reference to the management of the business?

A. My impression is that nothing important was done in the matter without consulting me. When she required money she came to me.

Q. So that she took an active part in the matter herself?

A. She took an active part in it; as much as any lady would who trusted in her husband and confided in his good intentions.

### CROSS-EXAMINED.

Q. You say that you said to Mrs. Bonesteel that she ought to have half; who did you suppose at that time was to have this right for Brooklyn? Who was to have the other half?

A. I was asked to buy an interest in it, and refused to give $100 for the whole of it. I had a doubt whether it was worth $100. I was well aware of the difficulties of introducing matters of this kind into a city like Brooklyn.

Q. You say that you said that Mrs. Bonesteel, you thought, ought to have half. Who was to have the other half?

A. Mr. Taylor owned the whole. My argument was this to Mr. Bonesteel: "Mr. Taylor owns the whole; by your industry you may possibly work up something; if you do it is fair that he should give your wife a half interest."

Q. Then you expected that Mr. Taylor and Mrs. Bonesteel would go on together?

A. I presumed that Mr. Taylor would sell out if he could, and as quick as he could.

Q. How many conversations did you have with Mr. Taylor, and to what effect?

A. Two conversations perhaps. We talked on various subjects. I told him I believed it was a good pavement, but I doubted whether there was any money to be made in it. I told him I was willing to advocate it, and I did advocate it. I gave instructions to the editor of the Brooklyn *Union* to get all the information he could on the subject, and to advocate it as strongly as the facts would admit of.

Q. Was there anything ever said by you, or in your presence, relative to this interest being transferred to Mr. Bonesteel?

A. Not a word?

Q. Or to Mrs. Bonesteel, in preference to being transferred to him?

A. It was distinctly understood that Mr. Bonesteel was a bankrupt, and it would be of no use to put it in his name, *and if it was transferred at all, I understood that Mr. Taylor gave it to Mrs. Bonesteel as he would a silver cup to her child.*

*After* Mr. Chittenden had laid the pavement in front of his own house, as described, and after it was advocated in the Brooklyn *Union,* one-half the license for Brooklyn was sold largely through the efforts of Mr. Bonesteel (acting, as his wife testified, as her agent), to Messrs. Page, Kidder & Co., for $10,000; and by the same instrument of conveyance by which this was done the *other half* was transferred to Mrs. Bonesteel herself.

Bonesteel, the husband, testified that he considered that the transfer was thus made to her, in consequence of what he had told Taylor about taking up his time away from business that he was carrying on as his wife's agent, and with her money; more especially since by his not attending to her business, he let the right season for selling pass, and so caused a loss to his wife of several thousand dollars.

How a *half* came now to be transferred to Mrs. Bonesteel instead of a *third,* which Taylor by that part of his testimony already quoted, stated that he meant originally to give her, was thus explained or sought to be by himself.

When so good a sale as the one to Page, Kidder & Co. for $10,000 had been made, Bonesteel, it seemed, had urged upon Taylor that he ought to be content with such a good sum of money, and give the remaining half to him or his wife. Taylor knew that Bonesteel had failed; and in regard to the whole matter stated thus:

" I said to Mr. Bonesteel when he insisted upon my giving the interest between the third and the half, that I wanted to keep it myself, and should not let his wife have it, but upon his urging matters I told him that I would not give it to him, but to his wife, as I did the other, for he was in debt, and if I did, his creditors would get it, and that I had nothing to give them.

I had not previously conveyed the one-half to his wife, but had made up my mind to give it to her as promised, and therefore considered it as given. He claimed that it was through Chittenden's influence that I sold the half of Brooklyn for what I got, and I thought it was, and I conveyed it. . . . I would not have conveyed the half if I had not thought thus of Mr. Chittenden's influence. I thought his influence of great importance, as he was rich and a prominent man in Brooklyn."

Page, Kidder & Co., being thus owners of one-half the licenses, and Mrs. Bonesteel holding the other half, they two—Bonesteel, the husband, acting for her, and as she testified as her agent—organized under the general law of New York, the Nicolson Pavement Company of Brooklyn; and transferring each their half of the license to the company received in return stock in its capital; this capital being fixed in the charter at $500,000.

As the result proved, Bonesteel was not "*always*" wild. This particular project, at least, proved a good one. Mrs. Bonesteel soon sold to a certain W. Smith & Co. one-half of her stock (a quarter of the capital) for $10,000, receiving the purchase-money and using it as her own; she left 356 shares in the company as working capital; sold 44 other shares for $2000, and used the money; gave her husband 5 shares, enough to enable him to become a trustee and president of the company, which he now was, at a salary of $4000, and had 1145 shares, charged to be worth $30,000, and impliedly admitted to be worth about $10,000, remaining in her own name.

It was these 1145 shares which her husband's assignee in bankruptcy, by the bill filed against him and her, now sought to recover for *his* creditors.

The bill set forth debts to the amount of $30,000, and assets, one worthless note; charged that the one-half interest vested in Mrs. Bonesteel was in truth conveyed to her in consideration of her husband's services, in negotiating and selling the other half; that the stock was, therefore, in fact the property of her husband, the now bankrupt. It charged further, that since the organization of the company, Bone-

steel had participated in its management, and had no other business; that many very profitable contracts had been since made with the city of Brooklyn for paving, &c. The bill prayed an account and transfer of the stock to the complainant, the assignee.

Both husband and wife answered, each denying every material allegation in the bill; her answer specially averring, that when the Nicolson pavement was brought forward, her husband was acting with her knowledge and approval as her agent, with money owned by her, advanced to her by her father, and with other sums used in support of the family and advanced by her, to be charged on any distribution of his property at his death as advances; that her husband continued to act as her agent in the matter of the pavement; that she had laid out large sums of her own money in advancing and protecting her interests in the company; and setting up generally a history such as the reader can readily infer from the case as already stated.

The reader will thus perceive that the question was really one of evidence on the facts; and one where the evidence was pretty much one way.

The court below dismissed the bill; and from that decree it was that the present appeal was taken.

*Mr. J. P. C. Cottrill, for the appellants; Messrs. J. Winslow and J. M. Van Cott, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Assignees of the estate of the debtor, in a proceeding in bankruptcy, may be chosen by the creditors, or if they make no choice, at their first meeting, the judge, or, in case there is no opposing interest, the register, may make the appointment, subject to the approval of the judge.* Section fourteen also provides that as soon as an assignee is appointed and qualified, the judge, or where there is no opposing interest, the register, shall, by an instrument under his hand,

---

* 14 Stat. at Large, 522.

assign and convey to the assignee all the estate, real and personal, of the bankrupt, and that the title to all such estate, with the deeds, books, and papers of the bankrupt relating thereto, shall, by operation of law, vest in such assignee. Such assignments, it was foreseen, might give rise to controversies, and the second section of the act, in view of that contingency, provides that Circuit Courts shall have concurrent jurisdiction with the District Courts, of the same district, of all suits at law or in equity which may or shall be brought, by the assignee in bankruptcy, against any person claiming an adverse interest, or by such person against such assignee, touching any property or rights of property of said bankrupt, transferable to or vested in such assignee.

Voorhees, the complainant, is the assignee in bankruptcy of the first-named respondent, and he alleges in the bill of complaint that the schedule of debts, filed by the bankrupt, shows that he owed debts to an amount exceeding thirty thousand dollars; that the schedule exhibits no assets except a certain note believed to be worthless; that the other respondent is the wife of the bankrupt; that she has standing in her name, upon the books of the Nicolson Pavement Company, a corporation organized under the general laws of the State of New York, eleven hundred and forty-five shares of the capital stock of said company, of the par value of one hundred and fourteen thousand five hundred dollars, and that she holds stock certificates of the said company for the said shares, which are believed to be of a value exceeding thirty thousand dollars. Apart from those matters the complainant also alleges that he, as such assignee, has received the required instrument, duly executed, assigning and conveying to him all the estate, real and personal, of the bankrupt, and that the said stock, as he believes, is in fact and truth the property of the bankrupt; and as such that it should have been included in the inventory of his property, and that it should be applied to the payment of the debts due to his creditors. All of said shares, it is ad-

mitted, are standing in the name of the wife of the bankrupt, but the complainant alleges that the facts and circumstances under which the title was acquired, as confirmed by the conduct of the respondents since that time, affords satisfactory evidence that the property of the shares is in the bankrupt, and he states what the facts and circumstances attending the acquisition were, as he is informed and believes, with great fulness and particularity. Appended to that statement are eleven interrogatories to the respondents, designed to elicit evidence to establish the truth of the alleged circumstances.

Service was made and the respondents appeared and filed separate answers. Among other things the last-named respondent admits that she is the wife of the bankrupt, that the shares mentioned in the bill are standing in her name upon the books of the pavement company, and that she holds the stock certificates therefor, but she alleges that the value of the stock is less than one-third of the sum alleged in the bill. On the other hand she denies that the stock is or ever was the property of the bankrupt, or that he ever had any interest therein, or that the shares should have been included in his inventory, or be applied to the payment of the debts due to his creditors, and she denies that the circumstances under which she became possessed of the stock are correctly set forth in the bill, and each and every allegation in that behalf, so far as the same are different from, or inconsistent with, the statement as set forth in her answer. What she alleges is, that prior to that time she was engaged in the dry goods business, her husband acting as her agent and attorney in fact in carrying on the business; that the business was conducted in her name and for her account, upon capital furnished to her by her father; that he made advances to her exceeding twenty thousand dollars, which she employed in carrying on that business or expended in paying the expenses of their family; that the assignee of the patent described in the bill desired to secure her services and influence, and through her the influence of her friends, in the interest of that improvement, and proposed if she

would render such services and procure the aid and influ ence of her friends for the same purpose that he would give her a one-half interest and right in his assignment or license to lay such pavement in that city, and would also give her husband employment in promoting the enterprise and ac- complishing the undertaking; that she accepted the propo- sition and rendered the promised service in all proper ways in her power, and that the other contracting party, in con- sideration thereof, conveyed a one-half interest in the enter- prise to her as he had proposed, and that such conveyance was made and received in good faith and without any intent of defrauding the creditors of the bankrupt; that none of the money, assets, or property of the bankrupt was used to procure such conveyance, nor is the same in any way repre- sented in the shares of the capital stock of the pavement company now held and owned by the respondent. Suffice it to say, without reproducing the further details of her an- swer, that she claims and avers that she is legally and equi- tably entitled to hold, and that she does hold the shares in question as her separate and individual estate.

Substantially the same defences are set up in the answer of the other respondent. He admits that the first-named respondent is his wife, that the stock stands in her name, and that she holds the stock certificates; but he denies that the stock is or ever was his property; that he has or ever had any interest in the same, or that it should have been included in his inventory, or that it should be applied to the payment of his debts as alleged in the bill. Concurring with the other respondent he also denies that the circum- stances under which she acquired the shares are such as are alleged in the bill, and avers that the shares mentioned are the individual and separate property of his wife, as alleged in her answer.

Proofs were taken on both sides, and the court having heard the parties, entered a decree for the respondents, dis- missing the bill of complaint, and the complainant appealed to this court.

Before proceeding to examine the errors assigned it be-

comes necessary to make some further reference to the circumstances of the transaction, in order that the questions presented for decision may be fully understood. Both parties agree that the title to the shares in question came from the owner of the license, granted by the patentee of the pavement invention, to lay that pavement in the city of Brooklyn, and the pleadings and proofs show that the bankrupt, acting as the agent of his wife, negotiated a sale to the firm therein mentioned of one-half of the right for the sum of ten thousand dollars, and that the owner of that license, in consideration of those services and the services in the same behalf rendered by the wife, agreed to assign the other half of the license to the wife, who is the present holder of the shares. Pursuant to that agreement the owner of the license, on the seventh of December, 1866, made an assignment of the whole license, conveying one-half to the last-named respondent, and the other half to the firm by whom it had previously been purchased; and it appears that the sale and transfer were ratified by the patentee on the tenth of May following. By this arrangement the last-named respondent became the owner of one-half of the license interest, but she subsequently sold to William Smith & Co. one-half of her interest so acquired for the sum of ten thousand dollars, and received the consideration to her own use, and expended the money for the support of herself and family.

All the parties interested came together on the fifth of November, subsequent to the execution of the confirmatory license by the patentee, and organized the pavement company, and in consideration of the transfer of that license to the company, the several parties received certificates in due form for their respective proportions of the same, the last-named respondent receiving eleven hundred and fifty shares of the stock, being one-fourth, less four hundred shares reserved for the working capital of the corporation. Forty-four of the reserved shares were subsequently transferred to the same respondent, and the proofs show that she sold the same as her own property and appropriated the avails to

pay her family expenses. Five of the shares first allotted to her she gave to her husband that he might be qualified to act as a trustee in the company, leaving the eleven hundred and forty-five shares standing in her name.

It is claimed by the assignee that the half-interest in the license right was transferred to the wife of the bankrupt at a time when he was insolvent, in consideration of the services rendered by the bankrupt, and that the avails belonged to his creditors, and that the ownership vested in the wife is simply a cover and a fraud. Accusations of fraud may well be dismissed, as nothing of the kind is alleged in the bill of complaint, and it is well-settled law that affirmative relief will not be granted in equity upon the ground of fraud unless it be made a distinct allegation in the bill, so that it may be put in issue by the pleadings.*

Suppose, however, the rule was otherwise, and that the complainant may prove fraud, and be entitled to relief upon that ground, even if he has not alleged anything of the kind, still the result must be the same, as he has not introduced any sufficient proof to establish the charge or to warrant the court in adopting that theory, even if the charge was made in the bill. Instead of that, the theory of the bill is that the half-interest in the pavement license was conveyed to the wife in trust for her husband, and that the shares in question are now held by her to his use, as representing to that extent the one-half interest of the pavement license, which, as the complainant alleges, was purchased for the benefit of the bankrupt.

Confessedly the claim in that view is distinctly alleged in the bill, but the difficulty which the complainant has to encounter in attempting to support that theory is that every material allegation of the bill in that behalf is distinctly denied in each of the answers, and that the proofs, instead

* Noonan v. Lee, 2 Black, 508; Moore v. Greene, 19 Howard, 69; Beaubien v. Beaubien, 23 Id. 190; Magniac v. Thomson, 15 Id. 281; Same Case, 2 Wallace, Jr., 209; Eyre v. Potter, 15 Howard, 42; Fisher v. Boody, 1 Curtis, 206.

of being sufficient to overcome the answers, afford satisfactory grounds for holding that the theory of the respondents is correct.

Courts of equity cannot decree against such denials in the answer of the respondent, on the testimony of a single witness. Where the denial is distinct the rule is universal that the complainant under such circumstances must have two witnesses, or one witness and corroborative circumstances, or he is not entitled to relief, as he cannot prevail if the balance of proof be not in his favor, and he must have circumstances in his favor in addition to his single witness in order to turn the balance.*

Evidence is entirely wanting to show that the holder of the shares in dispute, or her grantor, or her husband, ever intended or supposed that the conveyance of the one-half interest in the license was made to the wife in trust for her husband. Taken as a whole, the proofs, instead of supporting that theory, show very satisfactorily that the property was conveyed to the holder of the shares, in pursuance of a prior agreement between her and her grantor that she should have such an interest as her own, and that it was received by her without any suggestion from any source that the title was in any manner qualified, or that it was not to be her own separate property.† Confirmation of that view is derived from the conduct and declarations of all the parties, during the negotiations and at the time of the transfer. Throughout she always treated the property as her own, and the husband constantly acquiesced in that claim. She sold a part of the interest and received the purchase-money, and disposed of it as her own, and when the pavement company was organized, she joined with the others interested in the enterprise, and transferred her remaining interest to the company and became a stockholder, accepting the eleven hundred and fifty shares as her proportion of the stock to be divided at that time among the shareholders. All agreed

---

* Clark's Ex'r *v.* Van Riemsdyk, 9 Cranch, 160; Hughes *v.* Blake, 6 Wheaton, 468; Delano *v.* Winsor, 1 Clifford, 505.

† Voorhees, Assignee, *v.* Bonesteel, 7 Blatchford, 498.

in treating her as the owner of a quarter interest in the license, and they assigned the shares to her as her separate property, and the evidence shows that she has always dealt with the interest in the license and in the stock as her own.

Attempt is made in argument to show that the conveyance of the one-half interest in the pavement license was made, in part at least, in consideration of the services of the bankrupt, and it must be conceded that some of the proofs tend strongly to support that theory, but the answer to the suggestion made by the respondents, deduced from the same proofs, is satisfactory and conclusive. Those same proofs also show that in rendering those services the bankrupt was acting as the agent and attorney in fact of his wife, that for some time previously he had been engaged in transacting her business, using the money furnished to her by her father, and that the respondent in rendering the services which it is urged constituted a part of the consideration for the sale of the half interest in the pavement license, he was acting in her behalf and to promote her interest.

Under the laws of New York a married woman may manage her separate property, through the agency of her husband, without subjecting it to the claims of his creditors, and it is held that she is entitled to the profits of a mercantile business, conducted by the husband in her name, if the capital is furnished by her and he has no interest but that of a mere agent.* Where the husband has no interest in the business it is also held that the application of a portion of the income to the support of the husband will not impair the title of the wife to the property.† Married women, at common law, could take title to real or personal property by conveyance from any person except the husband, but where no trust was created her personal property vested absolutely in her husband when reduced to his possession, and he became possessed of her chattels real in her right with

---

* Abbey v. Deyo, 44 Barbour, 381.

† Buckley v. Wells, 33 New York, 520; Sessions Acts 1848, 307; Id. 1849, 528; Id. 1860, 157.

power to alien them at his pleasure during her life, and if he survived her, they became his absolute property. Statutes, such as those above referred to, are intended to divest the title of the husband, as such, during coverture, and to enable the wife to take the absolute title as though she were unmarried.* Laws of the kind have the effect to modify so far the antecedent disabilities incident to the conjugal relation, as to secure the wife in the beneficial enjoyment of the new interests she is permitted by law to acquire, and it is expressly held that she is at liberty to avail herself of the agency of her husband as if they had not been united in marriage.† Those laws vest in the wife the legal title to the rents, issues, and profits of her real estate as against the husband and his creditors, and it is held that the husband cannot, as formerly, acquire title to such property in virtue of his marital rights. Consequently it is held that where the legal title to property is in the wife, as against her husband, it cannot be seized to satisfy his debts without proof that in the given case her title is merely colorable and fraudulent as against his creditors, which is decisive of this case, as nothing of the kind was either alleged in the bill or established by any sufficient evidence.‡

Apply that rule to the case and it is clear that the decision of the Circuit Court is correct, and the decree is accordingly

AFFIRMED.

---

* Draper *v.* Stouvenel, 35 New York, 512; Kelso *v.* Tabor, 52 Barbour, 127.

† Owen *v.* Cawley, 36 New York, 600.

‡ Gage *v.* Dauchy et al., 34 New York, 293; Webster *v.* Hildreth, 33 Vermont, 457.