ROWE v. DROHEN et ux. *

(Circuit Court of Appeals, Second Circuit. November 26, 1919.)

No. 5.

HUSBAND AND WIFE ⬤═▷149(4)—PROPERTY RESULTING FROM WIFE'S BUSINESS NOT SUBJECT TO HUSBAND'S CREDITORS.

Where, after a husband was deeply indebted and insolvent, a wife on her own capital entered business and acquired property, the spouses cannot be treated as partners, and the profits of the business subjected to claims of the husband's creditors, though he assisted in the business and at times spoke of it as his; the business being that of the wife, who furnished the capital.

Rogers, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of New York.

Bill of Murle L. Rowe, as trustee of James L. Drohen, bankrupt, against James L. Drohen and Mabel R. Drohen, his wife. From a decree dismissing the bill (245 Fed. 684), complainant appeals. Affirmed.

Herman J. Westwood, of New York City, and Nelson J. Palmer, of Dunkirk, N. Y. (Murle L. Rowe, of Dunkirk, N. Y., and Louis G. Monroe, of Fredonia, N. Y., of counsel), for appellant.

Nugent & Heffernan and Warner & Woodin, all of Dunkirk, N. Y. (T. P. Heffernan, of Dunkirk, N. Y., of counsel), for appellees.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

WARD, Circuit Judge. March 1, 1916, James L. Drohen was adjudicated a bankrupt on his own petition, and on September 15 his trustee, Rowe, filed a bill in equity against him and his wife under section 70e of the Bankruptcy Act (Comp. St. § 9654), praying that they might be required to convey to him certain pieces of real estate in the city of Dunkirk, N. Y., standing in the name of Mrs. Drohen, the leases in his and her names of certain moving picture theaters, together with their furniture and equipment, also a balance of account in the Merchants' National Bank of Dunkirk in the name of Mrs. J. L. Drohen, all of which property the plaintiff charged was acquired out of the proceeds of J. L. Drohen's business and fraudulently transferred to Mrs. Drohen or purchased in her name for the purpose of hindering, delaying, and defrauding his creditors. Judge Hazel dis-

⬤═▷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 251 U. S. —, 40 Sup. Ct. 396, 64 L. Ed. —.

missed the bill, and his opinion is reported in 245 Fed. 684. The plaintiff's counsel states his theory of the situation as follows:

"The complainant now feels that it has justified the statement, made earlier in the brief, that in the latter part of December, 1906, or early in 1907, while the Dunkirk Theater was in contemplation, or about the time the parties were getting ready to open it, the two defendants entered into the fraudulent and unconscionable agreement or understanding that, if the venture should prove a success, they would both declare that the business was hers, and point to the bank account as proof, while, if it turned out a failure, they would both assert that the venture was his, and point to the lease and the contracts he had made as evidence thereof; the result of which would be that, if it should succeed, success should inure to their benefit through her apparent ownership, while, if it should fail, creditors on the executory agreements or his own future creditors might seek in vain for their money, for, to use Drohen's own language, in a similar case later, where the venture did fail, 'I have a large judgment against me.'"

The bill alleges that on the 1st day of December, 1906, and for some time previous thereto, James L. Drohen was insolvent and at no time thereafter had any property whatever, unless that claimed in the bill belonged to him. Furthermore the plaintiff concedes that all of the property so claimed was the direct result of the success of a little moving picture show called the Bijou Theater opened in Dunkirk in February, 1907.

In March, 1906, Mrs. Drohen, her husband, and her mother lived in a small house inherited by Mrs. Drohen and her mother from her father. March 31 of that year Mrs. Drohen bought a small additional property, 414 Central avenue, paying $500 down, lent her by a warm personal friend, and securing the balance of the purchase money by mortgage. What property there was in the family at that time belonged to her, and the plaintiff does not contend that James L. Drohen had any interest whatever in these premises. In 1905 James L. Drohen was being sued for infringement of a patent, and April 23, 1906, an interlocutory decree was entered against him on the merits, which ripened in January, 1910, into a final decree for some $10,000.

In 1906 Mrs. Drohen opened a little notion store in the Central avenue house, and, and while engaged in that business her attention was attracted to a moving picture show. Concluding that this would be a good business venture, she sold out her stock in trade, and December 12, 1906, opened a bank account in the Merchants' National Bank of Dunkirk in the name of Mrs. J. L. Drohen, with a credit of $300 given to her personally by the bank, and in February, 1907, started the Bijou Theater in a vacant store, 303 Lion street. Subsequently, in 1909, she opened another little moving picture theater in the neighboring town of Silver Creek, where she employed a manager named Geitner, and in 1910 she built a larger theater in Dunkirk, known as the Drohen Theater.

During the whole of this period James L. Drohen managed the theaters, made some leases and contracts in his own name, and often spoke and acted as if the business were his own. While the conduct of the defendants during this period of 10 years was sometimes more consistent with ownership in James L. Drohen, and sometimes with ownership in his wife, the plaintiff's theory does not commend itself

to us at all. To state in detail all the particulars and weigh the evidence would make an interminable opinion. Suffice it to say that in the small town of Dunkirk it could not but be perfectly apparent to every one that all the property here involved was the result of these moving picture enterprises. Whether the business failed or succeeded, the unpaid creditors of the business would look to these properties for payment. The creditors existing at the beginning of the business in 1906 were James L. Drohen's and they were, in view of this moderate enterprise, of considerable amount. If it was intended to hinder, delay, or defraud creditors, these are the creditors who would have been considered. As against them it would have been more natural to put the bank account in the name of Mabel R. Drohen than in that of Mrs. J. L. Drohen, and Drohen could have drawn checks on such an account under authority from Mrs. Drohen. It would have been still more natural to let her sign the checks, as she might well have done, only about 3,000 checks having been drawn in about 10 years. Moreover as to such creditors he would have been careful not to speak of it as his, or to contract in his own name. Everything was done for a long time after the business was obviously a success openly and with such inconsistencies as preclude a premeditated purpose to defraud. Just such inconsistencies are what might be expected in dealings between husband and wife, and they rebut any inference of the calculated conspiracy which the plaintiff suggests. Schreyer v. Scott, 134 U. S. 405, 10 Sup. Ct. 575, 33 L. Ed. 955.

The real question is, With whose capital was this successful series of adventures started? because their profits belong to the owner of that capital. The evidence is quite clear that this capital was Mrs. Drohen's, and though the success was largely due to her husband's management and skill, her right to the profits was in no way affected by that fact. Aldridge v. Muirhead, 101 U. S. 397, 25 L. Ed. 1013; Merchant v. Bunnell, *42 N. Y. 539. It would be quite natural that, in managing, he would often act and speak as if he owned the business. We should not expect to find formal agreements to be made and the usual business precautions to be taken between husband and wife. If the conduct of the parties is consistent with honesty, we should adopt that theory, rather than the very artificial conspiracy which the plaintiff suggests. The conclusion of the trial judge, who saw and heard the witnesses, is entitled to great weight in an appellate court, and we are entirely satisfied with it.

The decree is affirmed.

HOUGH, Circuit Judge (concurring). That plaintiff has not proved "the fraudulent and unconscionable agreement" adverted to in the opinion of WARD, J., I agree. There was no definite plan or meeting of minds, except that which customarily springs from matrimony—i. e., an agreement to work together.

In 1906 the husband was deep in debt and determined not to pay, wherefore the common American habit of keeping whatever flowed into the family coffer in the husband's name was deliberately changed for the plan of keeping everything in the wife's name. But the hus-

band transferred nothing to his wife, because he then had nothing worth mentioning to transfer.

The evidence shows only the practice, so well known in this country, of the man "doing business in his wife's name," i. e., making the wife owner of the fruits of the debtor husband's labor, in consideration of support and protection. To be sure the measure of support is usually (as here) what the husband takes, and the protection is only required (as here) against old creditors, but the plan is as yet, I think, lawful in this country.

We cannot treat husband 'and wife (as such) as partners, and permit the creditors of one to demand an accounting; and rarely does the married pair enter into that formal relation, for to do so (assuming its possibility) would usually defeat the avowed object of both, which is to shield the husband behind the wife. This may, I think, be done as to earnings after the shield is erected.

It is plain enough that this husband often spoke of the business of Mrs. Drohen as "his," and boasted of "his" success. But the evidence falls far short of proving "reputed ownership," even if that doctrine obtained in the United States—which, however, is not the case.

For these reasons, I concur in affirming the decree.

ROGERS, Circuit Judge (dissenting). I do not concur in the conclusion which my Associates have reached. The trustee in bankruptcy of James L. Drohen is, in my opinion, entitled to make available to the creditors certain assets which stand in the name of the bankrupt's wife.

The claim is that the wife in 1907 began the moving picture business in the Bijou Theater in Dunkirk in December, 1906, and that her husband acted as her agent in its management. The husband at that time was insolvent; a judgment having been entered against him on April 23, 1906, in the sum of $10,723.30, which still remains wholly unpaid. In addition to that indebtedness, he was liable on a bond dated July 12, 1904, and given to the Title Guaranty & Trust Company, upon which judgment has since been entered in the sum of $17,321.02, upon which judgment he has paid nothing. According to the testimony of the husband, the wife had not been engaged in any business of any kind prior to entering upon the moving picture business in the Bijou Theater. He also testified that his wife had no property of any kind at that time, except her interest in the house where they were living. The house belonged to his wife and mother-in-law, and was sold subsequently for $2,500 or $3,000.

A week after the judgment for $10,723.30 was entered the husband, on April 30, 1906, closed the account which he had always kept in the Merchants' National Bank of Dunkirk; and on December 12, 1906, an account was opened in the same bank in the name of the wife. It is somewhat significant that it was not opened in the name of Mabel R. Drohen, nor in that of M. R. Drohen, but in that of Mrs. J. L. Drohen. Prior to that time she had never had a bank account. It does not appear that she ever drew a single check against that account. Some 3,000 checks were before the court below, and every one of them was

signed in the husband's handwriting. The profits realized in the moving picture business were all deposited to the credit of this account. The record discloses that the husband drew checks against this account to pay for his lodge dues as well as for his clothing, and to pay the family doctor's bills, and the bills for groceries, meats, coal, gas, electricity, and other family expenses. He purchased with funds drawn from his wife's bank account an automobile, and in applying to the secretary of state for its registration and for renewals of that registration he had in 1914, 1915, and 1916, three times described himself as owner and swore to it. In other words, he exercised the same dominion over the bank account of his wife that he had exercised over his own. While the proceeds of the business were deposited to her credit, the liabilities stood against him. The lease of the Bijou Theater ran to him as lessee, and the contracts for electric current for the theater and other supplies, as well as with the employés, were made in his name. As late as 1916 he gave his note for $5,000 to the Goodman Piano Company of Cleveland, Ohio, for a fotoplayer No. 40, which was to be used in the theater. The reserve seat tickets issued for admission to reserved seats in the Drohen Theater had the following printed thereon:

"Theater ticket. Drohen Theater, James Drohen, *Owner* and Manager."

From the time the Drohen Theater was opened in 1910 Mrs. Drohen handled all these tickets. She testified she did not know whether she ordered them printed, or whether he did, but said, if he ordered them, she knew all about it. The record shows that there was no agreement on the part of the wife to pay to the husband any salary for his services, and that there was no accounting to her for any moneys he saw fit to draw from her bank account. The Bijou business having proved a success, a second theater, called the Drohen Theater, was opened in Dunkirk, and later another in Silver Creek, and still another in Jamestown. The leases in these enterprises ran to the husband as the party of the second part, and contracts were made as before in his name, and the proceeds realized from the theater enterprises were deposited in the wife's account.

I do not accept the theory that the husband was simply the wife's agent. The record discloses a conversation between Mrs. Drohen and a third party, in which Mrs. Drohen objected to something Drohen was thinking of doing in the business, and Mrs. Drohen remarked that she wished Drohen would not do it, but it would not do her any good to say anything, as he would do as he wanted to anyway. The reason why he did as he wanted, rather than as she wished, is disclosed in another conversation between Drohen himself and a contractor, who was making certain alterations in one of the theaters, in which Drohen said that he had to do business in his wife's name, because he did not dare to have anything in his own name. That the business was his, and that he carried it on in his wife's name, explains everything.

But the understanding that the business was to be carried on in the wife's name was not always consistently carried out, although the proceeds of the business were always consistently placed to her credit

in the bank. The Jamestown theater was not a success, and the wife testified that that was his venture, and that she had nothing to do with it, although she admitted that the checks to cover running expenses were paid out of her account. When Drohen found that that particular venture was not a success, he wrote the agent representing the lessor, "I am sorry to say that I am busted, and cannot pay the rent" of the theater any more. The result of those business operations carried on by the husband in the wife's name, and into which she had little or nothing of money or experience to put at the beginning, may be seen in the following excerpt from her testimony:

"I own at the present time the following pieces of real estate: The Drohen theater, and the Blood lot. The house and lot on Fourth and Eagle streets my mother and I own. Those are the only pieces of real estate I own. In addition to that I have the fixtures and personal property at the Bijou Theater, the fixtures and personal equipment at the Drohen, one-quarter interest in the equipment, lease, and fixtures of the Silver Creek theater, and then such household goods as I have. I have no other property besides that, which I recall. I also have a $500 certificate, or a certificate calling for $500 capital stock in the Mann Company. I bought that. It was in my name. That was bought out of the proceeds of the moving picture show ventures that I spoke of."

What Drohen himself thought about it appears from what he said to Judge Fisher when he was taking, in his own name, the lease of the Jamestown theater. He stated:

"That he owned the new Drohen Theater in Dunkirk, free of incumbrances, in his own name; that he owned the Bijou Theater in Dunkirk, and the Bijou Theater in Silver Creek, all in his own name, with no judgments against him; and that he was worth over $40,000."

It is said that statements made by the husband, and not known by or assented to by the wife, are not binding upon her. They are to be considered, however, in connection with all the circumstances of the case, and if the testimony shows that husband and wife were parties to an unconscionable and fraudulent agreement or understanding that they should engage in the moving picture business under such conditions that if the venture should prove a success they should be in a position to say that the business was hers, as shown by her bank account, and if it turned out a failure to say that the venture was his, as shown by the leases and the contracts, then his acts and declarations during the pendency of the illegal enterprise, even if made in her absence, affect them both. This being in brief outline the facts disclosed by the testimony, what is the law that is applicable to them?

Do the facts of the case at bar show good faith on the part of Drohen and his wife, and that he acted really in what was done simply as her agent, or was he in fact a principal? In answering that question it is to be kept in mind that direct evidence is not necessary to prove fraud, but circumstantial evidence is sufficient. That principle of law is well settled. Beardsley v. Duntley, 69 N. Y. 577; Montreal River Lumber Co. v. Mihills, 80 Wis. 540, 50 N. W. 507; Woolenslagel v. Runals, 76 Mich. 545, 43 N. W. 454; Trimble v. Reid, 97 Ky. 713, 31 S. W. 861; Bank of North America v. Sturdy, 7 R. I. 109; Bronson v. Vaughn, 44 W. Va. 406, 29 S. E. 1022; Grier v.

Dehan, 5 Houst. (Del.) 401; Granrud v. Rea, 24 Tex. Civ. App. 299, 59 S. W. 841. In Beuerlien v. O'Leary, 149 N. Y. 33, 38, 43 N. E. 417, 418, the New York Court of Appeals declares that fraud "can seldom be proved by direct evidence." In Kaine v. Weigley, 22 Pa. 183, the court, speaking through Chief Justice Black, says that—

"When creditors are about to be cheated, it is very uncommon for the perpetrators to proclaim their purpose, and call in witnesses to see it done. A resort to presumptive evidence, therefore, becomes absolutely necessary to protect the rights of honest men from this as from other invasions."

And in Montgomery Web. Co. v. Dienelt, 133 Pa. 585, 19 Atl. 428, 19 Am. St. Rep. 663, the court, speaking through Chief Justice Mitchell and criticising the charge of a trial judge, comments as follows:

"But the substantial defect of the charge is in its treatment of the items of evidence, one by one, without at any time directing the view of the jury to their united force. There probably never was a case of circumstantial evidence that could not be blown to the winds by taking up each item separately, and dismissing it with the conclusion that it does not prove the case, The cumulative force of many separate matters, each perhaps slight, as in the familiar bundle of twigs, constitutes the strength of circumstantial proof."

The property of a debtor belongs to his creditors, and he cannot transfer or conceal it with a view of hindering, delaying, or defrauding them. But a distinction exists between property and services. It may be conceded that a man's services, time, talents, and industry are his own, to use or not to use as he sees fit. The law may compel him to give up his property for the payment of his debts, but it may be conceded that it does not compel him to employ his time or talents for the benefit of his creditors.

At common law a married woman could not engage in trade or business in her own name for her personal profit. The reason was that she could make no contracts and her earnings belonged to her husband. The law has been changed by statute in this country and in England, and for years a married woman in the state of New York, where Drohen and his wife resided, has been expressly authorized by statute to engage in trade or business as if unmarried. Bodine v. Killeen, 53 N. Y. 93.

For the same reason a married woman at common law had no power to authorize her husband to become her agent. Capacity to act by agent depends on capacity in the principal to do the act himself which he authorizes his agent to perform. But when the wife's disability to contract was removed, she acquired the right to appoint her husband as her agent, to perform for her whatever acts of business she is capable of performing for herself. She may therefore constitute her husband as her agent within the sphere in which she is competent to appoint an agent. Voorhees v. Bonesteel, 16 Wall. 16, 21 L. Ed. 268. And in the case just cited the court said:

"Under the laws of New York a married woman may manage her separate property, through the agency of her husband, without subjecting it to the claims of his creditors, and it is held that she is entitled to the profits of a mercantile business conducted by the husband in her name, if the capital is furnished by her and he has no interest but that of a mere agent."

That was the law of New York then, in 1872, and for years prior thereto. And of course it is the law of that state now. Knapp v. Smith, 27 N. Y. 277; Buckley v. Wells, 33 N. Y. 518; Draper v. Stouvenel, 35 N. Y. 507; Sammis v. McLaughlin, 35 N. Y. 647, 91 Am. Dec. 83; Owen v. Cawley, 36 N. Y. 604; Abbey v. Deyo, 44 N. Y. 343; Woodworth v. Sweet, 51 N. Y. 11; Bodine v. Killeen, 53 N. Y. 93; Stanley v. National Union Bank, 115 N. Y. 122, 22 N. E. 29.

When a business is carried on in the wife's name and by her husband as her agent, it becomes necessary to determine whether the arrangement is one made in good faith, or whether her name is used as "a cover and a fraud" to protect what belongs to the husband in whole or in part. That ownership in the wife cannot be employed as "a cover and a fraud" to cheat creditors is abundantly established upon the authorities.

In Abbey v. Deyo, supra, the court held it to be well settled that a married woman could carry on business on her separate account through her husband as her agent, and that the fact that the husband gave his services without compensation other than his support, which she provided out of the income of the business, would not give his creditors any interest in the profits. But that case, and all the cases so far as I am aware, requires good faith. In Abbey v. Deyo the court said:

"The judge charged the jury that they were to find whether the plaintiff was in fact carrying on business herself, her husband acting merely as her agent, or whether the business was in fact her husband's, and the agency a form or device for carrying on business with his own means and her son's services. If the former, he charged them that the wife could hold the property. If the latter, he charged them that the property belonged to the creditors, and the wife must be defeated. This was the precise question for the jury to decide, and it was clearly and fairly placed before them. Their decision is conclusive here."

In Knapp v. Smith, supra, the New York Court of Appeals, speaking through Chief Justice Denio, said:

"Where the husband is indebted and insolvent, as was the case here, there is generally more or less reason to suspect that such arrangements are adopted as a cover to disguise the substantial ownership of the husband and to defraud the creditors. Whether, in a given case, the transaction is sincere and bona fide, or a colorable device to cheat the creditors of the husband, is a question of fact, to be determined by the jury or other forum intrusted with decision of such questions."

In Seitz v. Mitchell, 94 U. S. 580, 24 L. Ed. 179, the Supreme Court declared that purchases of property, real or personal, made during coverture by the wife of an insolvent debtor are justly regarded with suspicion, and that she cannot prevail in contests between his creditors and her, involving their right to subject property so acquired to the payment of his debts without overcoming by affirmative proof the presumption against her. "Such," said the court, "has always been the rule of the common law; and the rule continues, though statutes have modified the doctrine that gave the husband absolutely the personal

property of the wife in possession, and the right to reduce into his possession and ownership all her choses in action."

In Glidden, Murphin & Co. v. Taylor, 16 Ohio St. 509, 91 Am. Dec. 98, it appeared that the husband used the money of his wife in establishing and conducting the business professedly as her agent and the business made large profits. There was no contract between them as to his compensation, and no accounts were kept between the parties. He applied a part of the proceeds to the support of the family, used some of them for his own purposes, and invested the rest in real and personal property in the name of his wife. The court allowed the creditors of the husband to subject the property so purchased to payment of his debts.

In Lachman v. Martin, 139 Ill. 450, 28 N. E. 795 (1891), a judgment for $1,802.43 had been obtained against one Martin and another and execution was returned unsatisfied. The bill sought to subject to the payment of the judgment certain lands the title to which was in the name of Martin's wife. It was claimed that Mrs. Martin had purchased with her own funds one-half of the stock of an Illinois corporation, and that the money with which the property was purchased had been earned in the business of this corporation, while her interest in it was under the management and control of her husband acting therein as her agent. The profits which she derived from the corporation brought her between $25,000 and $30,000, which she had invested in farms and stock, which at the time of the hearing had so increased in value as to be worth $50,000. The Illinois statute gave a married woman the right to have her own separate property, and to make contracts and do business as a feme sole, and declared that she might avail herself of the services and agency of her husband in the conduct of her business or management of her property, "without necessarily subjecting it, or the profits arising from his management, to the claims of his creditors." The court, upon the facts disclosed in the case, held that the property in these farms was subject to the rights of the husband's creditors. The court said:

"But an insolvent debtor cannot use his wife's name as a mere device to cover up and keep from his creditors the assets and profits of a business which is in fact his own. The marriage relation affords many opportunities for conducting schemes to defraud creditors, and hence transactions between husband and wife, which have the appearance of being fraudulent, will be closely scrutinized. It is a question of fact, to be determined from all the circumstances of the case, whether or not the husband is carrying on his own business, or is merely managing his wife's business. It must clearly appear that the wife is the bona fide owner of the capital invested in the business, and that the accumulations, which result from the conduct of the business, are the legitimate outcome of the investment of her property."

In Murphy v. Nilles, 166 Ill. 99, 46 N. E. 772 (1897), the court held that where a wife furnishes capital to her husband and allowed him to employ it in speculations on his own account and in conducting the business the profits derived therefrom are subject to the claims of his creditors. In the course of the opinion the court again declared that—

"An insolvent debtor cannot use his wife's name [nor her capital] as a mere device to cover up and keep from his creditors the assets and profits of a business which is in fact his own."

In Talcott v. Arnold, 54 N. J. Eq. 570, 35 Atl. 532 (1896), the court held that while a debtor cannot be compelled to work for his creditors, still, if he puts his latent property-earning ability into action, equity will apply any property created to the payment of his debts. It declared that a wife may employ her husband as a servant in the management of her separate business, but that a court of equity will closely scrutinize the case, to determine whether the employment is bona fide and whether the business is clearly the wife's; that if the husband, in conducting the wife's business, is a servant of the wife under a bona fide employment, then his services in the business will not subject any portion of the property to the claims of the husband's creditors. In this New Jersey case it appeared that after the failure of a firm in which the husband was a partner the wife advanced to him $10,000, which she had received from the estate of her uncle. The husband was an inventor, and carried on a series of experiments, and caused to be issued in his wife's name a number of patents, from which large sums of money were realized, and a portion of the proceeds was put in property in the wife's name. All the contracts in the business were made in her name, and the property in which the business was conducted and the bank accounts were also in her name. No contract of employment was proved, and the entire course of conduct showed that the husband was master of the business, over whom the wife exercised no control, and from whom she expected no account. The court held that the business was the husband's, and its proceeds would be applied to the payment of his debts. The husband and the wife testified that they had entered into an agreement at the time the $10,000 was advanced by which he assigned to her the patents issued and to be issued, in consideration that she should pay him $1,200 a year, and should pay all the shop expenses for the development of the patents.

The court declared it found no foundation in the testimony to support the theory that the business which was carried on ostensibly in the name of the wife was in fact the business of the wife. "Now," said the Vice Chancellor in his opinion, "the entire history of the business, from the year 1879 down, is convincing that she let him have her money whenever he wished it, without a question, and that he put all the patents in her name, for the purpose of securing his property to his family in case of business trouble, while in fact he retained as complete control over it as if he was its absolute owner. Every step taken in the business was the offspring of his thought and will alone. In all the transactions it is perfectly obvious that everything was left to him. His wife naturally had but the faintest knowledge of the work in which he was engaged, and exercised no oversight over the conduct of the business." The bank accounts were in the name of the wife, and he drew checks under a power of attorney from her. Contracts made were made in her name. The property in which the machines were manufactured was in her name. "But," said the Vice

Chancellor, "it seems to me transparent that all this was merely colorable. It was the husband who suggested the agency, who settled the terms of the contracts, who received and deposited the money arising from them, and who spent it, with no expectation, on his part or on her part, that he would ever be called upon to account to her for its receipt or expenditure. He kept no books of account, except of the most meager and partial kind of the receipts and expenses of the business. The wife never asked for an accounting, and never expected any, and he knew that she never expected any."

This case was reversed in the Court of Errors and Appeals (55 N. J. Eq. 519, 37 Atl. 891), but solely on the ground that that court believed, and the Vice Chancellor did not, in the substantial truth of the testimony of the husband and the wife concerning the agreement made between them. The court said their testimony was uncontradicted, and was corroborated by their conduct ever since the alleged making of the bargain. The court declared that—

"On the grounds above stated, we believe the contract to have been made bona fide for valuable consideration on both sides, and without any improper design."

In Taylor v. Wande, 55 N. J. Eq. 491, 37 Atl. 315, 62 Am. St. Rep. 818, the New Jersey Court of Errors and Appeals declared that a court of equity would carefully scrutinize the employment of an insolvent husband by a wife engaged in carrying on a business on her own account. In the circumstances of that particular case the court said it could find nothing in the facts which indicated that the husband acquired any interest in the profits or earnings of the business. "Had the husband's services been rendered to her gratuitously," it was said, "such would probably be the conclusion, for the debtor is not obliged to work for the benefit of his creditor; but when, as in this case, the services were rendered upon compensation, not shown to be unusual compensation for such services, it is beyond doubt that the profits and earnings of the business belonged to the wife, notwithstanding they were in part due to the husband's skillful services, precisely as they would do, had she employed a stranger of like ability to carry on the business."

In Mayers v. Kaiser, 85 Wis. 382, 55 N. W. 688, 21 L. R. A. 623, 39 Am. St. Rep. 849, it is laid down that the mere fact that the wife employs her husband as her agent to carry on her business in her name, will not give his creditors a right to have their claims paid out of the profits of the business, especially where the husband has been paid by the wife for his services. And so in Martin v. Remington, 100 Wis. 540, 76 N. W. 614, 69 Am. St. Rep. 941. In Kendall v. Beaudry, 107 Wis. 180, 184, 83 N. W. 314, 316, the court points out that there must be good faith and then says:

"In ascertaining the existence of this element, the question is whether the debtor does in fact give or hire his services to another, the fruits thereof to belong to that other, or does he merely exert himself under the color of another's name, with the understanding or purpose that the fruits of his exertion shall be his, but screened by that other's name from his creditors. The former situation satisfies all that is meant by the expression 'good faith' in

this connection. ⋅*  *  * He may be led to so act because of the hopelessness of attempting to devote his efforts to a business of his own, where they would be rendered abortive by the prompt attack of creditors as soon as they became at all productive. Such motive or reason is not inconsistent with the good faith of the transaction."

In Boggess v. Richard's Adm'r, 39 W. Va. 567, 20 S. E. 599, 26 L. R. A. 537, 45 Am. St. Rep. 938, the court held that a husband may engage in business with his wife's capital in her name and on her credit for her benefit; but if, owing to his skill and labor, large profits accrue therefrom over and above the necessary expenses and indebtedness of the business, including the support of himself, his wife and family, a court of equity will justly apportion such profits between his wife and his existing creditors.

The record in this case has convinced me that husband and wife were not acting in good faith, and that the husband had an interest in the proceeds of the moving picture business which his creditors are entitled to reach, and I think the judgment should have been reversed.